*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0064p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

　　　　　　　　*Plaintiff-Appellee,*

　　　v.

WILLIAM J. DAVIS,

　　　　　　　　*Defendant-Appellant.*

No. 03-4114

>

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 99-00110—Walter H. Rice, District Judge.

Argued: October 29, 2004

Decided and Filed: January 21, 2005[*]

Before: KEITH, CLAY, and COOK, Circuit Judges.

---

**COUNSEL**

**ARGUED:** C. Mark Pickrell, Nashville, Tennessee, for Appellant. Dwight Keller, UNITED STATES ATTORNEY, Dayton, Ohio, for Appellee. **ON BRIEF:** C. Mark Pickrell, Nashville, Tennessee, for Appellant. David J. Horne, UNITED STATES ATTORNEY, Dayton, Ohio, for Appellee.

　　　CLAY, J., delivered the opinion of the court, in which KEITH. J., joined. COOK, J. (p. 12), delivered a separate concurring opinion.

---

**OPINION**

---

　　　CLAY, Circuit Judge. Defendant William J. Davis appeals his conviction and sentence for bank fraud in violation of 18 U.S.C. § 1344, entered by the United States District Court for the Southern District of Ohio on August 29, 2003. For the reasons set forth below, we **AFFIRM** Defendant's conviction; however, in light of the Supreme Court's recent opinion in *United States v. Booker*, 543 U.S. ____, 125 S. Ct. 738 (2005), we **VACATE** Defendant's sentence and **REMAND** the case for resentencing in a manner consistent with this opinion.

---

[*] This decision was originally issued as an "unpublished decision" filed on January 21, 2005. The court has now designated the opinion as one recommended for full-text publication.

# I. BACKGROUND

## *Procedural History*

On August 16, 1993, Defendant received a target letter from the United States Attorney for the Southern District of Ohio, advising him that the United States intended to initiate criminal proceedings against him for violations of 18 U.S.C. §§ 1014 and 1344. Nothing further occurred, however, until December 15, 1999, when Defendant was indicted. The indictment included five separate counts: Count 1 alleged a conspiracy between Defendant, his wife Marilyn K. Davis, and other unindicted coconspirators, to defraud the First National Bank of Dayton ("First National"), a federally insured financial institution, in violation of 18 U.S.C. § 371; Counts 2 and 3 alleged that Defendant made materially false statements in connection with federally insured loans, in violation of 18 U.S.C. § 1014; and Counts 4 and 5 charged Defendant with bank fraud in violation of 18 U.S.C. § 1344. Defendant was arraigned on January 14, 2000, and pleaded not guilty.

Defendant and his wife were tried jointly; their trial commenced on May 15, 2002. At the close of the government's case, Defendant moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29, and the court dismissed Counts 1 and 3 of the indictment. The court also dismissed the government's case against Mrs. Davis. On May 23, 2002, the jury returned its verdict, acquitting Defendant on Count 2 but convicting him on Counts 4 and 5.

Defendant's sentencing hearing was held on August 13, 2003, at which time the court sentenced Defendant to 33 months imprisonment, followed by five years supervised release. The district court entered its final judgment on August 29, 2003.

Defendant timely filed a Notice of Appeal with this Court on August 29, 2003.

## *Substantive Facts*

From 1978 until May, 1992, Defendant was the president and part-owner of Fries Correctional Equipment of Kentucky, Inc. ("Fries of Kentucky") and Fries Correctional Equipment of Ohio, Inc. ("Fries of Ohio"). Along with his wife and two daughters, Defendant was also partner in the D&A Company ("D&A"), an Ohio partnership. Fries was in the business of manufacturing and installing jail and prison equipment.

In November, 1989, a mutual acquaintance introduced Defendant to Neal Ratliff, then a commercial loan officer and vice-president at First National Bank.[1] Defendant was seeking financing for Fries of Kentucky, and was unhappy with his current bank. On June 1, 1990, First National approved a line of credit in the amount of $1.6 million for Fries of Kentucky. That same day, the bank also approved a loan to D&A for $1 million, and a $50,000 personal line of credit for Defendant. Regular payments were made on the D&A loan, and on September 30, 1991, First National renewed Fries of Kentucky's and Defendant's personal lines of credit.

The First National loans were only partially secured by Fries' accounts, inventory and equipment. Thus, in order to secure the original loans in 1990 and to renew them in 1991, First National required personal guarantees from Defendant and his wife. Defendant submitted personal financial statements to First National in 1990 and 1991.[2] The 1990 statement listed personal assets

---

[1]First National Bank of Dayton is now National City Bank.

[2]Fries was also required to submit an audited financial statement, which was prepared by an outside accounting firm. That statement failed to properly disclose that Fries of Kentucky had a default judgment of over $1 million pending against it in an Alabama court. First National eventually sued the accounting firm and collected $300,000 in

including property, livestock, stored crops, a gold and silver coin collection, and shares of stock other than Fries stock. The 1991 statement, submitted to First National on July 29, 1991, listed similar assets, including 140 shares of Pitney Bowes and Polaroid stock. The 1991 statement listed liabilities of $227,711.00, divided between mortgages, loans on life insurance, accounts payable, and accrued interest payable.

On April 25, 1991, Defendant and his wife borrowed $100,000.00 from Alice Baldwin, Defendant's mother-in-law. This debt was not recorded anywhere on Defendant's 1991 personal financial statement. At trial, Neal Ratliff testified about the importance of the guarantee, asserting that had the additional $100,000.00 debt been recorded it "would certainly reduce the strength of the personal guarantee," and would be a "negative."

In early 1992, Defendant notified Ratliff that Fries of Kentucky was having some financial difficulties, which Defendant connected to a large job pending in Connecticut. Defendant told Ratliff that he was thinking about selling the company, although a buyer never materialized. The Fries loan went into default in late February or early March of 1992. On April 1, 1992, First National sent a letter to Defendant advising him that the Fries loan was in default, and demanding that the principal balance of $1.6 million be paid in full.

Shortly after their letter to Defendant, First National filed a civil suit in the Montgomery County Court of Common Pleas, attempting to recover the balance on the Fries loan. On April 15, 1992, Defendant's deposition was taken in connection with the civil suit. Defendant denied that either he or his wife still owned any of the securities listed on their July, 1991 personal financial statement. However, Schedule D of their joint federal income tax return for 1992 indicates that they acquired fifty-six shares of Pitney Bowes stock on April 1, 1988, and sold the shares on October 29, 1992, realizing a capital gain of $1,189.92.

On May 7, 1992, Defendant and Mrs. Davis were escorted out of Fries' offices, and First National took control of the business, placing a receiver in charge. Shortly before First National took over, Neal Ratliff spoke with Defendant, asking him to transfer certain assets into his name. Ratliff was referring to the fact that on March 2, 1992, Defendant and Mrs. Davis executed six deeds conveying title in various properties to their daughter. Between February and May of 1992, Defendant also wrote thirteen checks, totaling over $86,000, from Fries' bank account to himself, his wife, and their two daughters. At Defendant's bank fraud trial, Ratliff testified that Defendant refused to transfer the assets back into his name, and said that "he would do what he had to protect his family and his assets."

Ultimately, First National sold Fries' assets, and Defendant and his wife declared bankruptcy. The bankruptcy proceedings were completed sometime in 1996. Despite collecting funds from both the sale of Fries' assets and Defendant's bankruptcy, the district court found that First National was still owed over $600,000 when Defendant was sentenced in 2003.

A jury convicted Defendant of two counts of bank fraud, stemming from his omission of the $100,000 debt in his 1991 personal financial statement and his denial that he owned the Pitney Bowes stock during his 1992 deposition. Defendant appeals both his conviction and the 33 month sentence imposed by the district court.

---

compensation. Defendant was charged under Count 2 with tendering a fraudulent financial statement which failed to properly disclose the default judgment, however, the jury acquitted him of that charge.

## II. DISCUSSION

Defendant raises several issues on appeal. First, he challenges his conviction, alleging that there was insufficient evidence presented at trial to convict him, and that the judge should have granted his motion for a judgment of acquittal under Rule 29. Second, Defendant argues that the district court improperly sentenced him by using the version of the Sentencing Guidelines in effect at the time of sentencing, as opposed to the time Defendant's crime occurred. Finally, Defendant claims that in calculating his sentence, the district court erroneously determined the amount of loss attributable to his conduct. We will address each of these contentions in turn.

### A.      Sufficiency of the Evidence

We have often noted that we "will sustain a jury's guilty verdict so long as, 'after viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt.'" *United States v. Ware*, 282 F.3d 902, 905 (6th Cir. 2002) (quoting *United States v. Beddow*, 957 F.2d 1330, 1334 (6th Cir. 1992)); *accord United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999); *United States v. Lutz*, 154 F.3d 581, 587 (6th Cir. 1998). Thus, Defendant "bears a very heavy burden" in his sufficiency of the evidence challenge to his conviction. *Spearman*, 186 F.3d at 746 (citing *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir. 1986)). The same standard for sustaining a jury verdict also applies to the district court's denial of Defendant's motion for a judgment of acquittal under Rule 29. *See United States v. Bowker*, 372 F.3d 365, 387 (6th Cir. 2004).

Defendant was convicted of bank fraud in violation of 18 U.S.C. § 1344.[3] There are three elements to the offense: (1) that the defendant knowingly executed or attempt to execute a scheme to defraud a financial institution; (2) that the defendant did so with the intent to defraud; and (3) that the financial institution was insured by the Federal Deposit Insurance Corporation ("FDIC"). *United States v. Everett*, 270 F.3d 986, 989 (6th Cir. 2001); *United States v. Hoglund*, 178 F.3d 410, 413 (6th Cir. 1999).

Defendant focuses his argument on the second element, intent to defraud. Defendant points to the district court judge's statement at sentencing that "[t]here's no question when this defendant initially took the loan, when Mr. Davis applied for the extension of the loan, he had every expectation that he would pay it back." Defendant argues that this comment shows that he did not have the requisite intent to defraud First National, and thus the jury verdict was unsupported by sufficient evidence.

We find absolutely no merit to Defendant's argument. First, as a practical matter, if the district judge actually believed that the government failed to prove an essential element of the crime, he would have been bound to grant Defendant's Rule 29 motion. The fact that at the close of the

---

[3]Section 1344 provides:

Whoever knowingly executes, or attempts to execute, a scheme or artifice --

(1) to defraud a financial institution; or

(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;

shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1344 (2004).

evidence the judge dismissed Counts 1 and 3 against Defendant, but not Counts 4 and 5, indicates that the judge separately evaluated the evidence with respect to the various counts, and did not believe the evidence was insufficient to support a conviction by the jury as to Counts 4 and 5. Second, we note that Defendant takes the judge's comments completely out of context. At the sentencing hearing, right after he made the above comment, the judge stated that it was "clear when Mr. Davis lied at a deposition about the ownership of certain corporate securities and when he took steps to conceal assets from the bank, he did intend to harm the bank." And third, regardless of the judge's comments about Defendant's intent, this Court has held that it is "not a defense [to § 1344] that the defendant 'may not have intended to cause the bank to lose any money; it is sufficient that he was shown to have intended to facilitate the transfer of bank funds' in pursuit of a fraudulent scheme." *Everett*, 270 F.3d at 991 (quoting *United States v. Kropp*, 132 F.3d 34, 1997 WL 735331 at **2 (6th Cir. 1997)).

Defendant also claims the evidence was insufficient to convict him because his misrepresentations to the bank came after First National extended money to him, and therefore he could not have intended to defraud the bank when he made the false statements. Once again, we are not persuaded by Defendant's argument. First, given that intent to defraud need not be an intent that the bank lose money, *see, e.g., Everett, supra*, a reasonable trier of fact could find that misstatements made after the loans were advanced, such as Defendant's failure to disclose the Pitney Bowes stock, were intended to defraud the bank. Second, Defendant erroneously claims that the personal financial statement omitting the $100,000 debt was submitted to First National in 1992, after the Fries loan went into default. However, the evidence presented at Defendant's trial clearly shows that the 1991 personal financial statement was submitted in July, 1991, and was used to secure the 1991 renewal of the Fries and personal lines of credit.

Defendant has failed to make any plausible arguments on appeal to show that the evidence presented at trial was insufficient to support his conviction. Given the deference that we afford to jury verdicts, and the heavy burden on Defendant, we decline to overturn Defendant's conviction under 18 U.S.C. § 1344.

## B.      Version of Guidelines Applied

Defendant contends that the district court erred in applying the 2002 version of the United States Sentencing Guidelines, which were in effect at the time of sentencing, as opposed to the 1991 or 1992 versions of the Guidelines, which were in effect at the time Defendant's offense conduct took place.[4] We preface our analysis of Defendant's argument by noting the relevance of the Supreme Court's discussion of the Sentencing Guidelines in the recent *Booker* decision. Under *Booker*, application of the Guidelines by the district court is not mandatory; however, the court, "while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." *Booker*, *supra*, 543 U.S. at ____, 125 S. Ct. at 767 (Breyer, J.). The statute directing the district court to consider the instructions set forth in the Guidelines, 18 U.S.C. § 3553 (a)(4), (5), has not been excised and severed by *Booker*. We read *Booker* to require that when district courts consult the Guidelines, they are to continue to consider the sentence, sentencing range, and pertinent policy statements contained in those Guidelines, as required by § 3553 (a)(4) and (5). In a case such as this one, where Defendant contests the manner in which the district court applied the consulted Guideline, we are instructed to review the sentence for reasonableness. *Id.*

However, Defendant did not object to the version of the Guidelines used by the district court, instead raising the argument for the first time on appeal. When a defendant fails to object to the use

---

[4]For the purposes of Defendant's case, the relevant provisions of the 1991 and 1992 versions of the Guidelines are identical.

of a particular version of the Guidelines before the district court, we review for plain error under Federal Rule of Criminal Procedure 52(b).[5]  *United States v. Green*, 305 F.3d 422, 432 (6th Cir. 2002) (citing *United States v. Fountain*, 2 F.3d 656, 669-70 (6th Cir. 1993)); *United States v. Koeberlein*, 161 F.3d 946, 949 (6th Cir. 1998).  This is so even after *Booker*, which instructs us "to apply ordinary prudential doctrines, determining, for example, whether the issue was raised below and whether it fails the 'plain-error' test." *Booker*, 543 U.S. at ____, 125 S. Ct. at 769 (Breyer, J.); *see also United States v. Ameline*, 376 F.3d 967, 978-79 (9th Cir. 2004) (pre-*Booker*, case applying *Blakely v. Washington,* 542 U.S. ____, 124 S. Ct. 2531 (2004), to Guidelines, but concluding that because the defendant failed to object to his sentence before the district court, plain error analysis governs review).  Thus, we will proceed with our analysis under established plain error law.

Because Defendant forfeited his right to object below, he bears the burden of persuading this Court that application of the 2002 Guidelines was plain error.  *See United States v. Vonn*, 535 U.S. 55, 63, 122 S. Ct. 1043, 152 L. Ed. 2d 90 (2002).  In order to show plain error, Defendant must satisfy the following criteria: "(1) that an error occurred in the district court; (2) that the error was plain, *i.e.*, obvious or clear; (3) that the error affected defendant's substantial rights; and (4) that this adverse impact seriously affected the fairness, integrity or public reputation of the judicial proceedings." *Koeberlein*, 161 F.3d at 949 (citing *Johnson v. United States*, 520 U.S. 461, 467, 117 S. Ct. 1544, 137 L. Ed. 2d 718 (1997); *United States v. Thomas*, 11 F.3d 620, 629-30 (6th Cir. 1993)); *see United States v. Olano*, 507 U.S. 725, 732-37, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993).

Generally, the district court is instructed to apply the version of the Guidelines in place at the time of sentencing.  U.S. SENTENCING GUIDELINES MANUAL ("U.S.S.G.") § 1B1.11(a) (2002).  However, the Guidelines clearly instruct the court to apply the version in place at the time the defendant's offense was committed if applying the current Guidelines would amount to a violation of the *ex post facto* clause,  Article I, § 9, cl. 3 of the United States Constitution.  U.S.S.G. § 1B1.11 (a), (b)(1) (2002)[6]; *see also Miller v. Florida*, 482 U.S. 423, 107 S. Ct. 2446, 96 L. Ed. 2d 351 (1987); *United States v. Kussmaul*, 987 F.2d 345, 351-52 (6th Cir. 1993).  The *ex post facto* clause is implicated where a law punishes retrospectively; "[a] law is retrospective if it 'changes the legal consequences of acts completed before its effective date.'" *Miller*, 482 U.S. at 430, 107 S . Ct. 2446 (quoting *Weaver v. Graham*, 450 U.S. 24, 31, 101 S. Ct. 960, 67 L. Ed. 2d 17 (1981)); *see also United States v. Milton*, 27 F.3d 203, 210 (6th Cir. 1994) (noting that "when the guidelines in effect at the time of sentencing provide for a higher range than those in effect at the time the crime was committed . . . an *ex post facto* problem exists and the court must not impose a sentence in excess of that allowed by the older guidelines.") (citation omitted).

Defendant was sentenced to 33 months imprisonment under § 2B1.1 of the 2002 Guidelines.  The base offense level under § 2B1.1 is 6, and the district court added 14 by calculating the loss attributable to Defendant's conduct as being between $400,000 and $1,000,000.  U.S.S.G. §

---

[5]Rule 52(b) states: "**Plain Error**.  A plain error that affects substantial rights may be considered even though it was not brought to the court's attention."  FED. R. CRIM. P. 52(b) (2004).

[6]Section 1B1.11 states, in relevant part:

(a)    The court shall use the Guidelines Manual in effect on the date that the defendant is sentenced.

(b)    (1)    If the court determines that use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the *ex post facto* clause of the United States Constitution, the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed.

U.S.S.G. § 1B1.11 (2002).

2B1.1(b)(1)(H).  The sentencing range for level 20, criminal history category I is 33-41 months.  Defendant contends that he should have been sentenced under the 1991 version of the Guidelines, which was in effect at the time of Defendant's offense conduct.  The relevant section under the 1991 Guidelines is § 2F1.1.  Section 2F1.1 also has a base offense level of 6, but only adds 11 for a loss between $800,000 and $1,500,000.  U.S.S.G. § 2F1.1(b)(1)(L) (1991).  The sentencing range for level 17, criminal history category I is 24-30 months.  Thus, Defendant argues, application of the 2002 Guidelines resulted in the imposition of a sentence 3 months longer than what he could have possibly received under the 1991 Guidelines.

The government rebuts Defendant's argument by alleging that his sentence would have been the same under the 1991 Guidelines, and thus there is no *ex post facto* violation, because had the 1991 Guidelines been applied, Defendant would have been eligible for a 2-level increase for "more than minimal planning."  Offense level 19, criminal history category I under the 1991 guidelines produces a sentence of 30-37 months.  Because Defendant's 33 month sentence is within this range, the government argues that even if it was an error for the district court to apply the 2002 Guidelines, Defendant's substantial rights have not been affected.

Before addressing the merits of Defendant's claim under the plain error standard, we note that the government's argument about the application of the "more than minimal" planning enhancement is highly speculative, particularly in light of *Booker*.  We previously stated that the "more than minimal planning" enhancement is appropriate in "(1) cases where more planning occurs than is typical for commission of the offense in a simple form; (2) cases involving significant affirmative steps to conceal; and (3) cases involving repeated acts over a period of time, unless each instance was purely opportune."  *United States v. Lutz*, 154 F.3d 581, 590 (6th Cir. 1998) (citations omitted).  Whether or not any of these factors applied was a matter committed to the discretion of the district court, and pre-*Booker*, imposition of the enhancement was  reviewed on appeal for clear error.  *Id.*  Post-*Booker*, however, it is unclear to us whether the district court judge could have applied the more than minimal planning enhancement at sentencing without running afoul of the Supreme Court's command that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the statutory maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt."  *Booker*, 543 U.S. at ____, 125 S. Ct. at 756 (Stevens, J.).

In addition to the speculativeness of the applicability of the "more than minimal planning" enhancement after *Booker*, we find another factor that counsels against our taking the government's view on this issue.  Had the district court applied the enhancement, the guideline range for Defendant's sentence would have been 30-37 months.  The actual sentence that Defendant received, 33 months, is clearly within that range;  however, it is also the lowest sentence Defendant could have gotten without a downward departure under the 2002 Guidelines.  At the sentencing hearing, the district court declined to give any downward departures, but the court specifically noted that it was sentencing Defendant to the lowest sentence possible under the then-mandatory Guidelines, due to his age and the delay in prosecution.  The court stated that "[n]ormally the Court would be inclined to sentence in the middle or the upper reaches of the guideline range," because the amount of loss was close to $1 million.  However, the court went on to state:

> I am mindful of the fact that [Defendant] is 69 years old and that in truth this offense took place eleven years ago.  And while that's not sufficient for a downward departure, in my opinion- in this Court's opinion, it qualifies for a sentence on the low end of the guideline range.

Based on these statements, had the district court applied the 1991 Guidelines even with the "more than minimal planning" enhancement, it is quite possible that Defendant would also have been given

the low end sentence of 30 months, which is still 3 months shorter than the 33 month sentence Defendant actually received. Therefore, we find that even with the enhancement, an *ex post facto* problem exists. *See United States v. Keigue*, 318 F.3d 437, 443-45 (2d Cir. 2003) (finding plain error where district court used incorrect version of Guidelines, but defendant nonetheless received a sentence within overlapping portion of both correct and incorrect Guidelines, and district court commented that it was sentencing defendant to low end of Guideline range).

Having identified an *ex post facto* problem, our inquiry is not at an end. We must determine whether the application of the 2002 Guidelines was plain error. Because we agree with Defendant that an *ex post facto* problem exists, we hold that the application of the incorrect version of the Guidelines was an error, and second, that the error was plain or obvious. The *ex post facto* clause announces a fundamental constitutional absolute. U.S. Const. Art. I, § 9, cl. 3 ("No Bill of Attainder or ex post facto Law shall be passed."). The Guidelines, as well as Supreme Court and Sixth Circuit precedent, clearly instruct the district court to apply the Guidelines in effect at the time the offense was committed if the application of the current Guidelines would work an *ex post facto* violation. *See, e.g.,* U.S.S.G. § 1B1.11(b)(1); *Miller*, 482 U.S. at 435, 107 S. Ct. 2446; *Milton*, 27 F.3d at 210; *Kussmaul*, 987 F.2d at 351-52. We therefore think that when the district court applied the 2002 version of the Guidelines, it committed an obvious error.

The third inquiry under the plain error test is whether the error affected Defendant's substantial rights. "This usually means that the error must have affected the outcome of the district court proceedings." *United States v. Cotton*, 535 U.S. 625, 632, 122 S. Ct. 1781, 152 L. Ed.2d 860 (2002) (quotation omitted); *see also Olano*, 507 U.S. at 734, 113 S. Ct. 1770 (stating that "in most cases [affects substantial rights] means that the error must have been prejudicial"). In this case, use of the 2002 Guidelines caused Defendant to be sentenced to anywhere from 3 to 9 more months than he would have gotten under the 1991 Guidelines, without the enhancement. "'[A] sentence based on an incorrect guideline range constitutes an error affecting substantial rights and can thus constitute plain error.'" *United States v. Hall*, 212 F.3d 1016, 1022 (7th Cir. 2000) (quoting *United States v. Robinson*, 20 F.3d 270, 273 (7th Cir. 1994)). Furthermore, even with the "more than minimal planning" enhancement, the district court's comments at sentencing make it seem likely to us that Defendant would have gotten the low end sentence of 30 months had the court used its discretion to apply the enhancement. "[W]here, as here, the record permits the inference that a defendant *would* have received a different, shorter sentence absent an unobjected-to error, the defendant's substantial rights have been affected within the meaning of Rule 52(b)." *Keigue*, 318 F.3d at 445 (emphasis in original).

The final inquiry is whether the error "seriously affect[s] the fairness, integrity or public reputation of the judicial proceedings." *United States v. Atkinson*, 297 U.S. 157, 160, 56 S. Ct. 391, 80 L. Ed. 555 (1936). Whether this factor is met is within this Court's discretion. *See Olano*, 507 U.S. at 735, 113 S. Ct. 1770, 123 L. Ed. 2d 508 ("Rule 52(b) is permissive, not mandatory. If the forfeited error is 'plain' and 'affect[s] substantial rights,' the court of appeals has authority to order correction, but is not required to do so."). Two factors counsel in favor of exercising our discretion to remand in this case. First, we again emphasize that the *ex post facto* clause is a constitutional mandate that laws must not punish retroactively. Where that mandate is violated, we think that it seriously affects the fairness and integrity of the judicial proceeding.

Second, we note that a number of other circuits have found plain error in the application of an incorrect version of the Guidelines. *See United States v. Syme*, 276 F.3d 131, 136 (3d Cir. 2002) (finding plain error and *ex post facto* violation where defendant was sentenced using enhancement not in effect at time crime was committed); *United States v. Chea*, 231 F.3d 531, 539-40 (9th Cir. 2000) (finding plain error standard met where incorrect version of Guidelines was applied at sentencing); *United States v. Comstock*, 154 F.3d 845, 850 (8th Cir. 1998) (finding plain error standard met where incorrect version of Guidelines was applied and *ex post facto* violation resulted);

*United States v. Orr*, 68 F.3d 1247, 1252-53 (10th Cir. 1995) (holding that retroactive application of revised Guidelines was an *ex post facto* violation which constituted plain error and required court to remand for resentencing); *United States v. Anderson*, 61 F.3d 1290, 1301 (7th Cir. 1995) ("We have held that a district court commits plain error when it applies the sentencing Guidelines in a manner that violates the Ex Post Facto Clause."); *United States v. Keller*, 58 F.3d 884, 893 (2d Cir. 1995), *abrogated on other grounds by United States v. Mapp*, 170 F.3d 328 (2d Cir. 1999) (finding plain error and stating that "[b]ecause the wrong version of the Guidelines was used to determine [defendant's] sentence, we must vacate it and remand for re-sentencing"). We find these other courts' analyses persuasive, and join them in concluding that because the wrong Guidelines were applied to Defendant, and an *ex post facto* violation resulted, this case must be remanded for resentencing.

## C.  Amount of Loss Calculation

Defendant also challenges the amount of monetary loss the district court concluded was attributable to his conduct. This issue is squarely governed by the Supreme Court's decisions in *Booker* and *Blakely*. It is now settled law that the Sixth Amendment forbids a judge from increasing a defendant's sentence based on facts not admitted by the defendant or proven to a jury beyond a reasonable doubt. *Booker*, 543 U.S. at ____, 125 S. Ct. at 746 (Stevens, J.); *Blakely*, 542 U.S. at ____, 124 S. Ct. at 2537. In other words, "[w]hen a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts which the law makes essential to the punishment and the judge exceeds his proper authority." *Blakely*, 542 U.S. at ____, 124 S. Ct. at 2537 (internal citations omitted).

Although Defendant vehemently objected to the amount of loss before the district court, he failed to do so on Sixth Amendment grounds. Defendant raised a Sixth Amendment argument for the first time on appeal, following the issuance of *Blakely*; thus, we review Defendant's sentence for plain error. *United States v. Oliver*, — F.3d —, 2005 WL 233779 (6th Cir. Feb. 2, 2005).[7] As noted in Part B, *supra*, the plain error test is met when there is an error, the error is plain, the error affected defendant's substantial rights, and the adverse impact of the error seriously affected the fairness, integrity or public reputation of the proceedings. *See Koeberlein*, 161 F.3d at 949. In *Oliver*, after concluding that the district court's application of a particular enhancement violated the defendant's Sixth Amendment rights as delineated in *Booker*, the Court concluded that the four prongs of the plain error test had been met. *See Oliver*, — F.3d at —, 2005 WL 233779 at *6-8. Following *Oliver*, we also find that the plain error test is also met in the case *sub judice*.

The amount of the loss was not argued to the jury, which merely found Defendant guilty of bank fraud under 18 U.S.C. § 1344. The amount of loss is not an element of the offense, but rather is relevant to Defendant's sentence under the Guidelines. At the time Defendant was sentenced, the Guidelines were mandatory and the district court was bound to apply them. Defendant argued to the district court that the amount of loss was as little as $161,000, or possibly no loss at all; conversely, the government argued that the amount of loss was $834,835.24. The district court judge rejected both the Defendant's and the government's calculations, and instead performed an independent review of the evidence and concluded that the amount of loss attributable to Defendant's conduct was $914,478.68. By making this determination, the district court did exactly what the Supreme Court found to be a violation of the Sixth Amendment in *Booker*: the district court engaged in independent fact-finding which enhanced Defendant's sentence beyond the facts established by the jury verdict or admitted by Defendant. *Booker*, 543 U.S. at ___, 125 S. Ct. at 756

---

[7]One day after the panel in *Oliver* filed its opinion, a different panel of this Court filed *United States v. Bruce*, — F.3d —, 2005 WL 241254 (6th Cir. Feb. 3, 2005). To the extent *Bruce* conflicts with *Oliver*, we note that we must follow *Oliver* because it was decided first. *See* 6TH CIR. R. 206(c).

(Stevens, J.).    We therefore find that Defendant's sentence was in error, and that the error was plain. *See Oliver*, — F.3d at —, 2005 WL 233779 at *7.

Under the 2002 Guidelines applied by the district court, an amount of loss between $400,000 and $1,000,000 adds 14 levels to the base offense level, and in Defendant's case yielded a sentencing range of 33-41 months imprisonment. U.S.S.G. § 2B1.1 (b)(1)(H) (2002).  By contrast, had the district court determined that the amount of loss was the $161,000 figure raised by Defendant, only 10 levels would have been added to Defendant's base offense level, yielding a sentencing range of 21-27 months imprisonment.  § 2B1.1 (b)(1)(F).  Alternatively, had the court found no loss at all, nothing would have been added to Defendant's base offense level, and the sentencing range would have been 0-6 months imprisonment.  § 2B1.1 (b)(1)(A).[8]  Clearly, the district court's calculation of the amount of loss affected Defendant's substantial rights because it determined the length Defendant's sentence under the Guidelines.

Having found that there was an error, that the error was plain, and that it affected Defendant's substantial rights, we also find that it seriously affected the fairness, integrity or public reputation of the judicial proceedings below.  *See Oliver*, — F.3d at —, 2005 WL 233779 at *8; *United States v. Hughes*, — F.3d —, 2005 WL 147059 at *4-5 (4th Cir. Jan. 24, 2005).  Defendant's sentence plainly violates the Sixth Amendment, and we agree with *Oliver* that allowing it to stand "'would diminish the integrity and public reputation of the judicial system and also would diminish the fairness of the criminal sentencing system.'"  *Oliver*, — F.3d at —, 2005 WL 233779 at *8 (quoting *United States v. Bostic*, 371 F.3d 865, 877 (6th Cir. 2004)).  Therefore, we must remand Defendant's case for resentencing.

Finally, we note that our analysis of *Booker* rejects the notion that the maximum sentence authorized by § 1344,  30 years, is also the maximum sentence authorized by the jury verdict.  Our conclusion is compelled by the Supreme Court's own application of its holding to the facts in *Booker*.  Booker was convicted by a jury of possessing at least 50 grams of crack cocaine, based upon evidence that he had 92.5 grams of crack in a duffel bag.  *Id*., 543 U.S. at ____, 125 S. Ct. at 751 (Stevens, J.).  Had the district court calculated Booker's sentence using these amounts, the applicable Guideline range would have been 210-262 months.  *Id*.  However, the district judge engaged in independent fact-finding, concluded that Booker possessed an additional 566 grams of crack, and sentenced him to 360 months.  *Id*.  The additional quantity of crack was never argued to the jury, thus the Court concluded that "just as in *Blakely*, 'the jury's verdict alone does not authorize the sentence.  The judge acquires that authority only upon finding some additional fact.'"  *Id*. (quoting *Blakely*, 542 U.S. at ____, 124 S. Ct. at 2538).  The Court makes no reference to the maximum sentence authorized by the statute under which Booker was convicted, 21 U.S.C. § 841 (b)(1)(A)(iii), which incidentally is life imprisonment.  Rather, the Court's entire analysis refers to the maximum sentence authorized by the facts proven to the jury under the Guidelines: 262 months.  We are therefore persuaded that our analysis of Defendant's sentence under the Guideline ranges, and not the statutory maximum of 30 years, is correct.  Just as Booker's 360 month sentence, based on independent judicial fact-finding, violated the Sixth Amendment, so too did Defendant's 33 month sentence, based on the district judge's independent calculation of the amount of loss.  The case therefore must be remanded to the district court for resentencing.

## III.  CONCLUSION

---

[8]The contrast in possible sentences depending on the amount of loss are equally varied under the 1991 or 1992 Guidelines: Defendant's sentencing range for a loss between $800,000 and $1,500,000 is 24-30 months; for a loss of $161,000 the range is 12-18 months; and for no loss the  range is 0-6 months.  U.S.S.G. § 2F1.1 (b)(1) (A), (H) and (L) (1991).

For the reasons set forth above, we **AFFIRM** Defendant's conviction under 18 U.S.C. § 1344, but **VACATE** Defendant's sentence and **REMAND** this case for resentencing in a manner consistent with this opinion.

---

**CONCURRENCE**

---

COOK, Circuit Judge, concurring. I write separately only to note that *Booker* does not forbid all judicial fact-finding in sentencing, as a reader of the majority's opinion here might infer. The *Booker* majority held:

> If the Guidelines as currently written could be read as merely advisory provisions that recommended, rather than required, the selection of particular sentences in response to differing sets of facts, their use would not implicate the Sixth Amendment. We have never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range.

*United States v. Booker*, 125 S. Ct. at 750 (Stevens, J.). After *Booker*, of course, the guidelines *are* merely advisory. *Id.* at 757 (Breyer, J.). Thus, post-*Booker*, judges may enhance sentences based upon facts not found by the jury, provided they do not consider themselves required to do so.

With this clarification, I concur.