**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 07a0851n.06**
**Filed: December 14, 2007**

**06-3731**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | ON APPEAL FROM THE |
| *Plaintiff-Appellee,* | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE NORTHERN |
| v. | ) | DISTRICT OF OHIO |
| | ) | |
| **ARTHUR LEE BILLMAN, JR.**, | ) | **O P I N I O N** |
| | ) | |
| *Defendant-Appellant*. | ) | |

BEFORE:     BATCHELDER, COLE and GRIFFIN, Circuit Judges.

**R. GUY COLE, JR., Circuit Judge.**  Defendant-Appellant Arthur Lee Billman, Jr. ("Billman") appeals his jury conviction for being a felon in possession of a firearm in or affecting interstate commerce on or about September 24, 2003, in violation of Title 18, Section 922(g)(1) of the United States Code.  Billman presents the following issues on appeal:  1) a challenge to the district court's denial of his pretrial motion to suppress evidence obtained during two searches of Billman's house; 2) a claim that the evidence presented was insufficient for conviction; 3) a claim of prosecutorial misconduct; and 4) a claim that cumulative errors resulted in the denial of a fair trial.

For the reasons set forth below, we AFFIRM.

# I. BACKGROUND

## A. Facts

### 1. September 16 Search

On September 16, 2003, Billman's son Jon called 911 to report an armed robbery at Billman's home. Billman and his live-in girlfriend, Eugenia Berring, resided at 2192 Brownlee Avenue in Canton, Ohio. Based on the description provided by Jon, the police detained Robbie Umbles as he was walking in a nearby neighborhood. Police escorted Billman to the site where Umbles was being detained, and based on a positive identification by Billman, took Umbles to the police station. Billman accompanied the officers to the station, where he and Umbles both entered statements regarding the incident. Umbles claimed that he was purchasing marijuana from Billman when he instead stole the drugs at gunpoint; Umbles also informed police that Billman's basement housed an operation to grow marijuana. Billman claimed that he was purchasing marijuana from Umbles when Umbles robbed Billman at gunpoint. No charges were filed against Billman and following the entry of the voluntary statement, officers offered to drive him home. Billman accepted the ride, but requested to be dropped off at an auto repair store instead of home.

During the time that the officers were interviewing Billman, Canton Police Department Detective Joseph Mongold inquired at the Canton Prosecutor's Office as to whether the information provided by Umbles combined with historical complaints about a marijuana operation at the Brownlee residence were sufficient to allow the officers to obtain a search warrant for the home.

The prosecutor answered in the negative and suggested that the detectives try to obtain more information before filing for a warrant.

Mongold and Officer John Clark proceeded to the Brownlee home to conduct a visual inspection of the premises and to determine if a K-9 drug-detection dog would alert to the presence of drugs. When they arrived, the officers found that Berring was at home. Berring granted the officers permission to enter the yard and search the exterior of the home. This search turned up no information that would support a search warrant for the premises.

Mongold also requested Berring's permission to search the inside of the home. Berring stated that the officers could search the residence only if they had a search warrant. Sergeant Victor George, an officer whom Berring knew and trusted, was called on a cellular phone by Mongold and spoke with both Mongold and Berring. At this point, the testimony of Mongold and Berring diverges. Mongold states that following the conversation with George, Berring assented to the search. Berring states that while she did sign a consent-to-search form following the arrival of George, she did so based on the understanding that officers were in the process of obtaining a search warrant.

During the search of the home, the drug-detection dog alerted to the presence of drug residue on a grow light in the basement and a locked safe in the garage. The officers requested that Berring open the safe, which she eventually did in the presence of George. Berring states that she only opened the safe because Mongold threatened to obtain a search warrant, take the safe downtown, and have it cut open. Berring then stated that the items in the safe belonged to her and Billman's father,

Arthur Billman Sr., who lived across the street. George did not seize any of the property in the safe, but he observed multiple firearms and other items.

2.      September 24 Search

At some point on September 24, George was directed by the Canton Police Chief to proceed to the City Prosecutor's Office with Sergeant John Dittmore to obtain a search warrant. Instead, George proceeded to the office with Detective Daniel Heaton. At or around this time, Patrolman Bruce Lawver, who was providing surveillance on the Brownlee Avenue home, contacted Dittmore to inform him that a truck was leaving the home. Dittmore then asked Clark to effectuate a traffic stop so that the officers could continue the investigation.

Clark directed Berring, the driver of the truck, to stop and approached her vehicle, informing her that Dittmore wanted to speak with her. Berring claims that Clark told her she could not leave, and that she then waited ten minutes for Dittmore to arrive. Dittmore and Lieutenant Ronald Shank arrived in an unmarked car, accompanied by two marked cars, at which time Clark moved his cruiser in front of and facing Berring's truck, but not blocking it in. Dittmore informed Berring that the officers were doing a follow-up investigation regarding the weapons in the safe and that the police wanted access to the weapons, but that they did not have a warrant.

Berring contends that she refused consent absent a warrant, and that at some point Dittmore angrily waived a piece of paper and stated "here is your warrant. Now let's go back to the house." (Joint Appendix ("JA") 488.) Berring claims that she believed the paper to be a warrant. Dittmore

and the other officers present deny that Dittmore made any statements of this sort. Shank and Officer Ronald Broadwater then spoke with Berring while Dittmore took a phone call. During this conversation, the officers state that Berring gave consent to a search of the safe. Berring then drove back to her home and the officers followed behind.

Upon arriving at her home, Berring opened the garage door from the outside and entered the garage, and then opened the safe. The officers asked Berring to step away from the safe, which contained visible firearms, until Agent Charles Turner arrived with a consent-to-search form. Officers state that during the time they waited, Berring was calm and chatted about hunting, volunteering to show the officers her trophy room and stuffed animals.

Turner claimed that Berring seemed calm when he arrived at the house. Turner, Broadwater, and Berring sat at a dining table while Turner explained the consent form. Turner asked if Berring was literate, to which she answered in the affirmative. Turner read the form out loud and asked Berring if she understood it. Berring stated that she understood the form, and limited the scope of her consent to the safe in the garage, asking Turner to change the writing on the form to reflect the limitation. Turner indicated the limitation on the form and Berring signed it, at which point officers proceeded to collect the evidence from the safe.

The officers seized 26 guns, Billman's expired driver's license, an invoice dated after Billman's felony conviction and made out to Billman for a gun part, as well as other items. During this time, Berring allegedly described to the officers which guns were hers and which were Billman's.

    3.    <u>September 25 Search Warrant and Search</u>

Officers obtained a search warrant on September 25 and executed the search on the same day. Billman objected to the validity of the warrant based on the supporting affidavit. The Government did not concede that the warrant was invalid, but stipulated that it would not introduce any evidence obtained from this search during the trial.

**B. Procedural History**

Billman was indicted on November 16, 2004. On February 2, 2005, a superseding indictment was filed, accusing Billman of unlawful possession of 25 firearms on or about September 24, 2003. Prior to trial, Billman filed a motion to suppress the evidence obtained during the September 16, 24, and 25 searches. The district court conducted a hearing on these motions and denied the motions with respect to the September 16 and 24 searches. Billman proceeded to trial pro se with the assistance of two standby counsel from the Federal Public Defender's Office.

Over the course of the trial, the Government presented evidence that each of the guns had been manufactured in another state. During the direct examination of the Government's expert, the prosecution specifically asked the expert about the gun which the jury ultimately found that Billman unlawfully possessed, referring to it both as Exhibit 12 and as a Revelation 410 shotgun. The expert testified that the gun was manufactured in Connecticut.

Billman presented evidence that the gun was housed in a safe to which he did not have access, that the safe and guns inside it belonged to Berring and Billman's father, and that the couple had signed an agreement prior to the search demonstrating the items in the safe belonged to Berring and not Billman. The Government presented evidence that a receipt for a gun part made out to Billman was in the safe and that a gun that Billman had possessed at one time was in the safe as well.

One of the Government's agents testified that Berring had informed him that Billman had a key to the safe as well.

Billman and the Government stipulated that Exhibit 12, the 410-gauge shotgun, belonged to Nicholas Berring, Billman's 10-year-old son.[1]  Both sides presented evidence that Billman accompanied members of his family on hunts and that Ohio law required adult supervision while minors were hunting.  The Government produced a May 2004 photograph of Billman and three of his children in hunting gear, including Nicholas, who was holding a shotgun.

On January 24, 2006, the jury found Billman guilty of possessing Exhibit 12, the Revelation 410-gauge shotgun, model 330A, in violation of 18 U.S.C. § 922(g)(1).  On January 31, 2006, Billman filed a motion for judgment of acquittal, pursuant to Fed. R. Crim. P. 29, and a motion for a new trial, pursuant to Fed. R. Crim. P. 33.  In addressing Billman's sufficiency-of-the-evidence claim, the district court ruled that the jury's verdict was based on sufficient evidence and was thus not unreasonable.

## II. Motion to Suppress

Billman argues that the district court erred in finding that Berring's consent to search was voluntary on both September 16 and 24.  When reviewing a district court's ruling on a motion to suppress, this Court reviews the district court's factual findings for clear error and the conclusions

---

[1]The superseding indictment and the district judge at one point referred to the gun as a Remington 410 gauge shotgun, while the verdict form and all other trial references are to a Revelation 410 gauge shotgun.  The at-trial identification by Billman and the Government's witness is sufficient to show that the court was at all times referencing Exhibit 12.

of law de novo. *United States v. Richardson*, 385 F.3d 625, 629 (6th Cir. 2004) (citations omitted).

A warrantless entry and search of a home is valid under the Fourth Amendment "when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained." *Georgia v. Randolph*, 547 U.S. 103, 106 (2006) (citations omitted). Consent "that is the product of official intimidation or harassment is not consent at all." *Florida v. Bostick*, 501 U.S. 429, 438 (1991). Further, "credibility is a key issue" in consent cases and this court "accord[s] considerable deference to the credibility findings of the trial court." *United States v. Cooke*, 915 F.2d 250, 252 (6th Cir. 1990).

The Government bears the burden of demonstrating "that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied." *Schneckloth v. Bustamonte*, 412 U.S. 218, 248 (1973). The *Schneckloth* Court continued, stating: "Voluntariness is a question of fact to be determined from all the circumstances." *Id.* at 248-49. The "'district court's findings with regard to voluntariness [of consent to search] will not be reversed unless clearly erroneous.'" *United States v. Salvo*, 133 F.3d 943 (6th Cir. 1998) (quoting *United States v. Taylor*, 956 F.2d 572, 777 (6th Cir. 1992) (alteration in original).

In determining that the September 16 consent was voluntary, the district court summarized the evidence before it and detailed the reasons that the consent was valid:

> Miss Berring's consent was voluntary and freely given. I point out that this is consistent with her testimony under oath at the Grand Jury, and while she testified

differently in this courtroom, her testimony in this courtroom was simply not credible.

First, Sergeant George, who obviously was friendly with Miss Berring, and who was there at the time and was the one who obtained the consent, testified that she did voluntarily and freely consent.

Second, as I said, she had previously testified under oath that she did consent.

Third, I watched her demeanor on the stand and did not find her to be credible.

She cried on cue, she changed the nature of her testimony more than once. It was not internally consistent. And the Court finds that her ability, her effort to retract from her prior sworn testimony under oath before the Grand Jury was unavailing and unconvincing.

(JA 509-512.) The district court's credibility determination is given deference by this Court, and in any event is supported by the evidence. The district court's determination that the consent was knowing and voluntary is a factual determination that is not clearly erroneous and is supported by the evidence.

For the September 24 search, the district court once again summarized the evidence, made a reasoned decision based on the evidence, and accounted for all of defendant's arguments against finding consent:

The other officers have testified that there were no raised voices, there was nothing untoward, that no one ever placed a hand on Miss Berring, and that she was not intimidated. The other officers say that she was asked to go back to the home and that she did do so.

. . . .

Once the [consent to search] form did arrive, the Court finds that Miss Berring did execute it. Again, she testified under oath that she did not execute it. She testified to that effect here in the suppression hearing. But that testimony is inconsistent with her sworn testimony before the Grand Jury.

> In addition the Court afforded the defendant the opportunity to hire a handwriting specialist. The Court paid for the services of a handwriting specialist and no testimony was presented . . .
>
> So the Court finds that ultimately, Miss Berring's decision to return home, to open the safe, and to allow a subsequent search of the safe, was also a voluntary decision to consent to that search.

(JA 514-17.) Once again, the district court's factual findings are not clearly erroneous and are supported by the evidence.

### III. Sufficiency of the Evidence

A motion for judgment of acquittal pursuant to Rule 29 due to insufficient evidence is reviewed under the same standard as an insufficient evidence claim. *United States v. Bowker*, 372 F.3d 365, 387-88 (6th Cir. 2004). Following a conviction, a defendant "bears a very heavy burden in his sufficiency of the evidence challenge to his conviction." *United States v. Davis*, 397 F.3d 340, 344 (6th Cir. 2005) (quotation omitted). For this Court,

> In reviewing a district court's denial of a motion for judgment of acquittal on a claim of insufficient evidence, "the relevant question is whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

*United States v. Lloyd*, 10 F.3d 1197, 1210 (6th Cir. 1993) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

The parties stipulated that Nicholas owned the 410-gauge shotgun, and there was no evidence that Billman had actual possession of it. Thus, it must be that the jury found Billman was in constructive possession of the gun.

In *United States v. Grubbs*, No. 04-5403, 2007 U.S. App. LEXIS 24252, (6th Cir. 2007), this Court summarized the circuit's constructive possession law:

> "Constructive possession exists when a person does not have possession but instead knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." [*United States v. Craven*, 478 F.2d 1329, 1333 (6th Cir. 1973).] In contrast to a situation where the defendant has physical contact with a firearm . . . constructive possession may be proven if the defendant merely had "dominion over the premises where the firearm is located." *United States v. Gardner*, 488 F.3d 700, 713 (6th Cir. 2007) (internal quotations and citations omitted).
>
> However, it is without question that "'[p]resence alone' near a gun . . . does not 'show the requisite knowledge, power, or intention to exercise control over' the gun to prove constructive possession." *United States v. Arnold*, 486 F.3d 177, 183 (6th Cir. 2007) (quoting *United States v. Birmley*, 529 F.2d 103, 107-08 (6th Cir. 1976)). "[O]ther incriminating evidence, coupled with presence" is needed to "tip the scale in favor of sufficiency." *Id.*

*Id.* at *11-12.

In this case, the evidence supporting constructive possession includes the undisputed evidence that Billman's son owned the 410-gauge shotgun, the gun was stored in a safe in Billman's garage, and that Billman was at times in close proximity to his ten-year-old son holding a shotgun. Given the testimony that adults must supervise minors when hunting, Billman's testimony that he accompanied his children during hunts, and the agent's testimony that Berring stated Billman had possession of a key to the safe, the district court's finding that there was sufficient evidence of constructive possession was not clearly erroneous. The jury's verdict was also supported by the evidence.

### IV. Prosecutorial Misconduct

Billman complains that the prosecutor's conduct at trial resulted in reversible error. While the prosecutor made some improper statements during the trial, the statements do not warrant a new trial when reviewed either individually or as a whole.

The question of whether a prosecutor's conduct amounts to prosecutorial misconduct, and whether it rendered the trial fundamentally unfair, are mixed questions of law and fact that are reviewed de novo. *See United States v. Francis*, 170 F.3d 546, 549 (6th Cir. 1999). When there is no objection at trial, the alleged improper conduct is reviewed for plain error. *United States v. Carroll*, 26 F.3d 1380, 1383 (6th Cir. 1994). Alleged conduct that is subject to an objection at trial is reviewed de novo. *United States v. Owens*, 426 F.3d 800, 806 (6th Cir. 2005). In conducting our review, we employ a two-step analysis, determining first whether the prosecutor's conduct was improper and second whether it was flagrant. *United States v. Tarwater*, 308 F.3d 494, 511 (6th Cir. 2002). "Improper remarks that are flagrant amount to *per se* reversible error; improper errors that are not flagrant may amount to reversible error in certain circumstances." *United States v. Hargrove,* 416 F.3d 486, 493 (6th Cir. 2005). In determining whether a statement was flagrant, the Court considers:

> (1) whether the remarks tended to mislead the jury or to prejudice the accused, [including whether the trial judge gave an appropriate cautionary instruction to the jury]; (2) whether they were isolated or extensive, (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused.

*United States v. Abboud*, 438 F.3d 554, 585 (6th Cir. 2006) (alteration in original) (citations omitted). If the statement was improper but not flagrant, reversal is only appropriate when "(1) proof

of defendant's guilt is not overwhelming, *and* (2) defense counsel objected, *and* (3) the trial court failed to cure the error with an admonishment to the jury." *Carroll*, 26 F.3d at 1385-86 (citing *United States v. Bess*, 593, F.2d 749, 757 (6th Cir. 1979) (emphasis in original).

**A. The Instances Complained of are Improper.**

Billman complains of three instances of misconduct. First, the prosecutor offered Exhibit 67 into evidence, despite its reference to Billman's participation in a drug-treatment program, a subject which the district court previously determined could not be referenced at trial. Second, the prosecutor's questioning of Billman's parole officer elicited testimony about Billman's parole violations, a subject that the district court had also determined was inadmissible. Third, the prosecutor's closing arguments falsely asserted that Exhibit 50 was a picture of a "crime as it occurred," where Exhibit 50 was the photograph of Billman standing near his son Nicholas, in hunting gear, while Nicholas held a shotgun. Although the prosecutor's conduct in the aforementioned instances was improper, it was not flagrant and does not require a new trial.

**B. The Misconduct was Not Flagrant.**

1.      Exhibit 67.

During its cross-examination of Billman, the Government produced a parole condition form signed by Billman. Billman was unable to make out the signature on the screen and requested that the Government enlarge the image, which the Government then did. The form contained a reference to psychological treatment and drug testing. Billman requested to approach the bench and the following side bar occurred on the record:

> MR. BILLMAN: You have banned Mr. Corts [the prosecutor] not to bring up drugs and counseling, and he brought it up. They all just looked at it.
> MR. CORTS: That's the - -
> MR BILLMAN: Right there it is. Drug counseling, and you just did it.
> MR. CORTS: That's over here.
> . . . .
> MR. CORTS: The only reason I would be using these two things is he signed, and then when he was released, that has that condition in there that he can never own or purchase a weapon. I'll put those up there.
> MR. BILLMAN: They already seen that now.
> MR. CORTS: They didn't see it.
> MR. BILLMAN: I seen it.
> THE COURT: Well - -
> MS. CRAMER: They only saw the enlarged part.
> . . .
> THE COURT: [A]t this point I am getting so nervous about the fact that you have gone so far down this road that I already know I have to give the jury a limiting instruction, and if we go any farther down that road, I'm going to have to tell them to disregard it all.
>
> So if you want to say, just so there's no debate and confusion, "When you were on parole, you understood that you couldn't own or possess a weapon, right?" If you want to ask him that question, you can, but don't use this document.

(JA 645-49.)

Thus, it appears that the improper portion of Exhibit 67 was shown to the jury by accident. In addition, the district court noted that the jury was unlikely to have seen the reference to drug counseling because it was in small type, the prosecutor focused the screen on Billman's signature quickly, and no reference was made to the such treatment during the examination. After Billman objected to the use of the document, the district court instructed the Government to avoid using the document and it was not presented before the jury again. Although no curative instruction was given

to the jury, the display was brief and the focus was on a different portion of the document. Thus, the

conduct was not flagrant and does not render the trial fundamentally unfair.

2.      Parole Officer Slater's Testimony.

After obtaining initial background information from Officer David Slater about his duties,

the prosecution proceeded to pursue questioning regarding Billman's period of parole:

> Q.      Can you tell us about any incidents at that time?
> A.      The time that I'm referring to is when he was returned to prison as a violator.
> Q.      And what was that for?
> A.      There were numerous violations.
>           MR. BILLMAN: Object.
>           THE COURT: Sustained.  The jury will disregard that comment.  The [G]overnment was instructed that that was inappropriate evidence.

(JA 545.)  Slater then testified that there had been an incident with a handgun that was found in

Billman's bedroom.  The prosecutor continued:

> Q.      And do you know if it was loaded or not?
> A.      Yes, it was.  Eight in the clip and one in the chamber.
>           MR. BILLMAN: Objection.
>           THE COURT: Sustained.  Approach.
> (At side bar on the record.)
>           THE COURT: I don't know if you are trying to invite a mistrial, but you are getting pretty close.  You are certainly getting my anger.  I told you not to do this.  I told you you could establish the continued ownership.  There's no reason to even address the question of whether it was loaded, and I told you to stay away from violations.
>           MS. CRAMER: I was shocked that he answered violations.
>           THE COURT: Did you talk to him about the limitations.
>           MS. CRAMER: Yes, Judge, at least three times.  At least three times, Your Honor.
>           THE COURT: Why did you ask him if it was loaded? Of what relevance is that other than to try to prejudice the jury?

(JA 546.)

This does not rise to the level of flagrant misconduct. While the district court expressed its strong disapproval to the Government, the district court also issued a curative instruction to the jury, instructing them to disregard the questions because they were improper. This misconduct, followed by a curative statement, is not flagrant and does not warrant a new trial. *See United States v. Sales*, No. 05-2522, 2007 U.S. App. LEXIS 21869, * 19-20 (6th Cir. 2007) (finding that the prosecutor's statement regarding defendant's prior felonies, while improper, were not flagrant when followed by a curative instruction).

3.      Prosecutor's Closing Argument.

During the Government's closing argument, the prosecutor made comments that resulted in the issuing of a curative statement by the district court. The Government displayed Exhibit 50, the photograph of Billman and his children, and stated: "The significance of this picture is, with it, you are getting to see the crime." Later, the Government's counsel stated: "So what you are looking at in this photo is the defendant in possession of firearms. . . . The person in control is the person who has always been in control, the defendant, Arthur Lee Billman, Jr." (JA 659.) Billman objected and the district court stated:

> Ladies and gentlemen, the [G]overnment just misspoke, seriously misspoke. Ms. Cramer represented that the photograph showed the crime occurring in this case.
>
> There's no evidence at all that this photograph was taken on September 23, 2004 [sic]. There's no indication that it was even close to that date. We have no idea when that photograph was taken . . . . [T]he statement that this shows a crime occurring is an incorrect

> statement, and even Ms. Cramer admitted at side bar that that's not what she meant to say.
>
> So its important that you understand that this is not evidence of any crime that's at issue here.

(JA 660.)

During the Government's rebuttal during closing argument, Billman once again objected to

the Government's argument:

> (MR. CORTS:) But, you know, a lot of times in these drug cases, we encounter - -
> MR. THOMPSON: Objection
> THE COURT: Sustained. Now you are going off into other circumstances. You need to wrap it up, Mr. Corts. This is supposed to be a brief rebuttal.
> MR. CORTS: In some cases people who are committing crimes hide the fruits of those in lots of different places.
> MR. THOMPSON: Objection.
> THE COURT: Sustained. Mr. Courts, I sustained the objection to that before. Do not speculate about what happened in other circumstances, and ladies and gentlemen, you must ignore all such argument.

(JA 661-62.)

Given the curative statements, and the instruction to the jury to disregard the prosecutor's

remark, any prejudice from the prosecutor's remarks were dissipated by the Court's admonition.

> 4.    The Statements Taken Together.

Reviewing the statements taken as a whole, the prosecutor's misconduct is not flagrant.

Under the first factor, "whether the remarks tended to mislead the jury or prejudice the accused

[including whether the trial judge gave an appropriate cautionary instruction to the jury]" *Abboud*,

438 F.3d at 584 (alteration in the original), the statements are not the type that would mislead the

jury. Exhibit 67 was likely not even seen by the jury, and the remaining statements were addressed clearly and directly by the district court. Further, while the statements may have been prejudicial, the district court's instruction to the jury dissipated any prejudice from the statements. As a result, the first factor weighs against Billman.

The second factor requires the Court to look at whether the improper remarks were isolated or extensive. *Id.* The three instances complained of by Billman, spread over a multi-day trial, do not rise to the level of extensive improper remarks. Accordingly, this factor weighs against Billman as well.

The third factor requires a review of whether the improper evidence and remarks were "deliberately or accidentally placed before the jury." Exhibit 67's introduction appears to have been an unintentional violation of the parties' stipulation. While the prosecutor's questioning of Slater was obviously intentional, Slater was aware that he should avoid any testimony about prior violations, making it appear that Slater's response was not solicited by the prosecution and may have been accidental. The statements regarding the Exhibit 50 photograph were intentional, but the prosecutor at side-bar asserted that she did not intend to suggest that the photograph was evidence of the crime. It thus appears that her statements were not deliberately placed before the jury.

Lastly, the court examines the strength of the evidence against the defendant. In this case, the evidence was not particularly strong. However, there was sufficient evidence supporting Billman's possession of the 410-gauge shotgun.

### IV. Cumulative Errors Resulting in a Denial of a Right to a Fair Trial

This Court reviews the cumulative effect of errors made at trial de novo in order to determine whether the errors created a trial that amounted to a denial of due process. *Lundy v. Burson*, 888 F.2d 467, 481 (6th Cir. 1989). Billman asserts that the denial of his suppression motion, the district court's ruling on his insufficient evidence claim, and the prosecutor's misconduct constitute errors that should result in a new trial. However, as addressed above, none of the district court rulings that Billman complains of above are errors, and, as such, they do not impact Billman's due process rights and do not constitute grounds for reversal.

## V. CONCLUSION

For the reasons stated above, this Court **AFFIRMS** the defendant's conviction.

.