RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 06a0287p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

          *Plaintiff-Appellee,*

    *v.*

    No. 05-6258

SYLVESTER MADU TUDEME,

          *Defendant-Appellant.*

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 04-00051—Aleta A. Trauger, District Judge.

Argued: July 20, 2006

Decided and Filed: August 9, 2006

Before: GILMAN and COOK, Circuit Judges; and DOWD, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Paul J. Bruno, Nashville, Tennessee, for Appellant. Darryl A. Stewart, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee. **ON BRIEF:** Paul J. Bruno, Nashville, Tennessee, for Appellant. Darryl A. Stewart, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee.

_____

## OPINION

_____

RONALD LEE GILMAN, Circuit Judge. Sylvester Madu Tudeme was charged with two counts of unlawfully using another person's identity to commit a felony offense, in violation of 18 U.S.C. § 1028(a)(7). After pleading guilty to one of the counts, he was sentenced to 21 months of imprisonment and 3 years of supervised release, and was ordered to pay $6,682.00 in restitution. On appeal, he challenges the sentence because the district court allegedly erred in determining the statutory maximum for the offense and in enhancing the sentence for an amount of loss in excess of $120,000. For the reasons set forth below, we **REVERSE** the judgment of the district court and **REMAND** for resentencing on a basis consistent with this opinion.

---

[*] The Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

# I. BACKGROUND

## A.    Factual background

In January of 2001, an account was opened at First Union Bank in Nashville, Tennessee in the name of Tommy Cypress. A deposit in the amount of $500, made by personal check, constituted the opening balance of the account. James M. Grant, a Tennessee state trooper who testified at Tudeme's sentencing hearing, identified three driver's licenses bearing Tudeme's photograph, one of which was in the name of Tommy Cypress.

Nine months after the account was opened, a fraudulent check in the amount of $155,166.30 was deposited. The check was originally drawn on a Unilever Cosmetics, Inc. account and made payable to Hess Magazine. It had been reported missing by Unilever, which had stopped payment on the check. By the time the check was deposited in the fraudulent account, it had been altered to name Tommy P. Cypress as the recipient. After the check was deposited, the bank received a call from a person identifying himself as Tommy Cypress. Per his instructions, the bank purchased stock in an energy company with the deposited funds, presumably for the benefit of the account holder. The bank immediately sold the stock, however, after discovering that the check was fraudulent. It incurred a loss of $6,682.50 on the sale. At this point the bank account was empty.

Three weeks after the fraudulent deposit, the bank was contacted by an electronics store when someone tried to pay by check for an expensive television set. The store had a routine policy of verifying personal checks in amounts over $1,000 before the customer could take a purchased item from the store. Because the check in question was drawn on the Tommy Cypress account, the bank called law enforcement. When the purchaser returned to the store later in the day to pick up his new television, law enforcement officers were waiting for him. They arrested the purchaser, who claimed to be Tommy Cypress, on state charges (the precise charges are not clear from the record). After his initial court appearance, the man finally identified himself as Tudeme.

Approximately three years after his arrest, a federal indictment charged Tudeme with two counts of knowingly using without lawful authority a means of identification of another person with the intent to commit a felony offense under Tennessee law, in violation of 18 U.S.C. § 1028(a)(7). One count dealt with Tudeme's opening and utilizing the First Union checking account in another person's name. The second count was for attempting to purchase the television set. Tudeme pled guilty to the second count and, pursuant to a plea agreement with the government, the first count was dismissed.

At his sentencing hearing, Tudeme testified that he opened the account in the name of Tommy Cypress as part of an undertaking with another individual named Tommy Lawson. The purpose of the account, Tudeme said, was to enable illegal immigrants without bank accounts to cash their payroll checks. Tudeme was to receive a fee for setting up the account and cashing the checks. He said that his only role after opening the account was to withdraw the money when Lawson asked him to. Tudeme further testified that Lawson had given him a blank check from the First Union account and told Tudeme that he was entitled to $5,000. With this check, Tudeme attempted to purchase the expensive television set.

## B.    The Presentence Report and the district court's sentence

The Presentence Report (PSR) recommended, pursuant to the 2000 edition of the United States Sentencing Guidelines (U.S.S.G.), that the district court utilize a base offense level of 6. U.S.S.G. § 2F1.1(a); 18 U.S.C. § 1028(a)(7). Pursuant to U.S.S.G. § 2F1.1(b)(1)(H), the PSR recommended a 7-level increase for an amount of loss exceeding $120,000 but less than $200,000. Two additional 2-level increases were made because there was more than one victim and because the offense involved a fraudulent identification. A 3-point reduction was then granted for

acceptance of responsibility. These calculations yielded a total offense level of 14. The PSR then found that Tudeme had no prior convictions, putting him in Criminal History Category I. Based on these conclusions, the PSR recommended a Guidelines range of 15 to 21 months of imprisonment and a 3-year period of supervised release.

The district court agreed with the Guidelines calculations set forth in the PSR and ultimately sentenced Tudeme to a term of 21 months of imprisonment, followed by 3 years of supervised release. With respect to the amount-of-loss enhancement to Tudeme's base offense level, the district court stated:

> In terms of the objection to the intended loss being not over . . . $120,000[,] . . . I deny that objection as well.

> It seems to be very clear from his testimony, even if he didn't know anything about this $155,000 check, his testimony was that Mr. Lawson was talking about huge numbers, 20 and $30,000 . . . a whack, payroll checks apparently for illegal immigrants.

> I find that this scheme with or without the $155,000 check was one intended to cause a loss of at least . . . $120,000.

The district court further ordered Tudeme to pay restitution to First Union in the amount of $6,682, the amount of loss it incurred in selling the energy stock. On appeal, Tudeme challenges the district court's imposition of a 3-year term of supervised release and the amount-of-loss enhancement to his sentence, but does not take issue with the order of restitution.

## II. ANALYSIS

**A.      Statutory maximum as it relates to the applicable term of supervised release**

Tudeme's first argument is that the district court misinterpreted the maximum penalty set forth in the statute, which impacts the maximum term of supervised release. We review the district court's statutory interpretation de novo. *United States v. Morris*, 203 F.3d 423, 424 (6th Cir. 2000) ("The present case involves a question of statutory interpretation and is, therefore, subject to de novo review.").

The district court determined that the statutory maximum sentence for Tudeme's offense was 15 years pursuant to 18 U.S.C. § 1028(b)(1)(D). This subsection covers the unlawful use of another's identification where the "individual committing the offense obtains anything of value aggregating $1,000 or more during any 1-year period." *Id.* In this case, Tudeme attempted to purchase a television set valued at over $4,000, thus satisfying the dollar amount set forth in the statute. But he counters that he did not actually "obtain anything of value" because the transaction was not consummated. He therefore argues that he should have been subjected to a statutory maximum sentence of only three years of imprisonment. *See* 18 U.S.C. § 1028(b)(2)(B) (2000) (setting forth a three-year maximum sentence for offenses involving the unlawful use of another's identification that do not satisfy the "obtained" dollar-value requirement in 18 U.S.C. § 1028(b)(1)(D)).

The district court correctly ruled against Tudeme on this point. In the statute setting forth the applicable offense, a separate subsection addresses the issue of attempts: "Any person who attempts or conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." 18 U.S.C. § 1028(f). This section specifically provides that the penalties for an attempted crime are the same as if the offense had been completed.

In this case, had the law enforcement officers stood by and allowed Tudeme to consummate the transaction for the television set, there would be no dispute that he was subject to the 15-year statutory maximum under 18 U.S.C. § 1028(b)(1)(D). Because the officers arrested him moments before the transaction was completed, he can be said to have only attempted the television purchase, as was found by the district court. The district court properly interpreted 18 U.S.C. § 1028(f) to provide as punishment for this attempt "the same penalties as those prescribed for the offense." Here the "same penalties" included a two-tiered statutory maximum based on the value of the goods in question. Because the item that Tudeme attempted to procure exceeded the threshold of $1,000, he is subject to the 15-year statutory maximum. The district court therefore did not err in this regard.

We now turn to how the statutory-maximum penalty impacts the applicable term of supervised release. As demonstrated above, the statutory maximum term of imprisonment for the crime Tudeme committed was 15 years. A 15-year felony is classified as a Class B felony. *See* 18 U.S.C. § 3581(b)(2) (applying to felonies with maximum terms of imprisonment of more than 12 years but not more than 25 years). The district court is authorized to include in a sentence for a Class B felony up to 5 years of supervised release. 18 U.S.C. § 3583(b)(1). As such, the 3-year period of supervised release to which Tudeme was sentenced fell well within the authorized term. The district court therefore did not err in imposing the 3-year term of supervised release.

## B.      Amount-of-loss increase to the base offense level

Tudeme's second argument relates to the amount of loss calculated by the district court. We review the district court's determination as to the amount of loss under the clearly erroneous standard. *United States v. Ellerbee*, 73 F.3d 105, 108 (6th Cir. 1996) (reviewing an amount-of-loss determination under U.S.S.G. § 2F1.1(b) using that standard); *United States v. Ware*, 282 F.3d 902, 907 (6th Cir. 2002) ("A factual finding is clearly erroneous where, although there is evidence to support that finding, the reviewing court on the entire [record of] evidence is left with the definite and firm conviction that a mistake has been committed."); *United States v. Davidson*, 409 F.3d 304, 310 (6th Cir. 2005) ("We continue, in reviewing individual Guidelines determinations, to apply the standards of review we applied prior to *Booker*.").

The commentary to U.S.S.G. § 2F1.1 states that the "loss is the value of the money, property, or services unlawfully taken." But, in cases of attempted crimes, "if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss." As one example, the commentary states that "if the fraud consisted of . . . representing that a forged check for $40,0000 was genuine, the loss would be $40,000."

Here, the district court enhanced Tudeme's base offense level by seven levels because the court concluded that the amount of loss was greater than $120,000 but less than $200,000. There are two purported justifications for this enhancement: (1) the fact that a fraudulent check in the amount of $155,166.30 was deposited into the account opened by Tudeme in a false name, and (2) the fact that the check-cashing scheme arranged between Tudeme and Lawson involved cashing large payroll checks ("20 and $30,000 . . . a whack," according to the district court), which cumulatively would add up to an amount in the seven-level enhancement range. Both justifications were advanced by the district court. ("I find that this scheme with or without the $155,166 check was one intended to cause a loss of at least . . . $120,000.")

We conclude that neither justification supports the district court's amount-of-loss finding. With respect to the first justification, Tudeme argues that he was not the one who deposited the $155,166.30 check and that he did not even know about the deposit. The government responds that the Guidelines provide that the amount of loss must include,

> in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense[.]

U.S.S.G. § 1B1.3(a)(1)(B). The question then becomes whether the deposit of this check into the fraudulent account, allegedly by a third party, was reasonably foreseeable.

In the course of the sentencing hearing, Tudeme testified about the scheme with Lawson whereby payroll checks of illegal immigrants would be deposited into the fraudulent First Union account and Tudeme would withdraw the money at Lawson's request, entitling Tudeme to a portion of the proceeds. This scheme made it reasonably foreseeable that payroll checks would be deposited into the fraudulent account. But what Tudeme could not have reasonably foreseen, based on the admitted scheme, was the deposit of (1) a check originally payable to a corporate entity (as opposed to a payroll check), (2) that was drawn on insufficient funds, and (3) that was payable in an amount far exceeding a normal payroll check.

The government at oral argument contended that the deposit of a check in *any* dollar amount into this fraudulent account, even if for one million dollars, would have been attributable to Tudeme in terms of the amount-of-loss calculation. This contention, however, stretches the term "reasonably foreseeable" beyond its limits. Because the evidence before the district court does not support the conclusion that Tudeme could have reasonably foreseen the deposit of the fraudulent $155,166.30 check, we are "left with the definite and firm conviction that a mistake has been committed" with respect to the amount-of-loss calculation based on the first justification provided by the district court. *See Ware*, 282 F.3d at 907.

The second justification provided by the district court was that the check-cashing scheme arranged between Tudeme and Lawson involved cashing payroll checks that cumulatively would add up to an amount in excess of $120,000. According to the court, these payroll checks were in the amount of "20 and $30,000 . . . a whack." Where the district court came up with this dollar amount for the payroll checks is totally unexplained. That any illegal immigrant would receive a payroll check anywhere near that amount is inconceivable, and even a single deposit of multiple payroll checks that add up to a number in this range finds no support in the record.

Moreover, even if there was evidence to support the conclusion that a large number of payroll checks were to be cashed using the fraudulent account in an amount that would eventually exceed $120,000, we find no basis in the record to suggest that these payroll checks cashed by Tudeme would have been drawn on insufficient funds. If the payroll checks were in fact legitimate, as we presume they were, we fail to see how any loss to the bank was intended by the scheme.

As with the first justification provided by the district court, the evidence available at sentencing does not support the conclusion that Tudeme intended a loss exceeding $120,000 by cashing payroll checks belonging to illegal immigrants. We are therefore "left with the definite and firm conviction that a mistake has been committed" in enhancing Tudeme's offense level based on the second justification provided by the district court. *See Ware*, 282 F.3d at 907.

## III.  CONCLUSION

For all of the reasons set forth above, we **REVERSE** the judgment of the district court and **REMAND** for resentencing on a basis consistent with this opinion.