[NOT RECOMMENDED FOR FULL-TEXT PUBLICATION]
File Name: 07a0287n.06
Filed: April 25, 2007

Nos. 05-3714; 05-3715; 05-3716

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff-Appellee**, | ) | **ON APPEAL** FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE SOUTHERN |
| | ) | DISTRICT OF OHIO |
| ISSA B. CONTEH, MICHAEL YANNI, | ) | |
| and KEITH EDWARD WALKER, | ) | |
| | ) | **MEMORANDUM** |
| | ) | **OPINION** |
| | ) | |
| **Defendants-Appellants**. | ) | |
| _____ | ) | |

**Before: BOGGS, Chief Judge and DAUGHTREY, Circuit Judges; MILLS, District Judge.**[*]

**RICHARD MILLS, District Judge.**

## I. BACKGROUND

On December 18, 2003, a Federal Grand Jury returned a 23-count Second

Superseding Indictment charging Appellants Issa Conteh, Michael Yanni, Keith

---

[*] The Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

1

Edward Walker, and others with conspiracy to commit money laundering, uttering and possessing counterfeit securities, and bank fraud. They pled not guilty to all counts.

A jury trial commenced on February 2, 2004. The next day, Walker moved to represent himself. The district court denied the motion as untimely. Trial then resumed.

The Government called a total of 46 witnesses. The evidence showed that Conteh, Yanni (a/k/a "Mitch Cooper"), and Walker were part of a Columbus, Ohio-based check counterfeiting ring that had ties to New York, New York and Portland, Oregon. Conteh obtained counterfeit checks from an unidentified source and had the checks delivered to him in Ohio. On at least one occasion, Yanni picked up a bag of checks while in New York and brought them to Conteh in Ohio. Checks were transported from Ohio to Indianapolis, Indiana and Wheeling, West Virgina in order to be cashed. The fake checks appeared genuine, having routing and account information which corresponded to real companies.

Conteh organized the scheme and directed its participants. Yanni and Walker were "middlemen" who recruited college-age men and women to deposit bogus checks and withdraw the proceeds. The people who deposited the bad checks and withdrew the proceeds were called "runners". Yanni and Walker gave

2

the names of the runners to Conteh and Conteh created counterfeit checks made payable to the runners. The runners included James Kombe, Melanie Micah Bowles, Akeshia Monet Jacobs, Sharmila Isaiah, Haniyyah I. Sabir, Shannon D. Weikert, Lemoyne Jackson, Shauna Philabaum, and Nath Chhuom. They often received a portion of the proceeds they withdrew. The runners' numerous withdrawals were timed to avoid detection of the scheme.

Witnesses testified that the runners presented bogus checks to financial institutions as if the checks were genuine. The runners routinely withdrew tens of thousands of dollars in this manner. Runner James Kombe withdrew $27,968 via a bogus check from Vascular Solutions and deposited the money into his personal account—at Conteh's direction—knowing that Vascular Solutions owed him no money. Kombe had been introduced to Conteh by Yanni in 2000. Kombe testified that Yanni took him to Conteh's home where Conteh provided directions about the check scheme. Another runner, Nath Chuuom, testified that Yanni and Walker jointly recruited her into the scheme, promising her money if she deposited and cashed checks and then remitted the proceeds.

Yet another runner, Shauna Philabaum, was brought into the scheme by "Mitch Cooper", an alias used by Yanni. Yanni had a sexual relationship with Philabaum and promised to help her when she told him that she was pregnant and

3

concerned about her finances. Yanni gave Philabaum a bogus corporate check made payable to her for $54,060.80. Philabaum deposited the check. When the bank advised her it was counterfeit, she phoned Yanni. She explained what happened and Yanni hung up on her. Philabaum subsequently decided to terminate her pregnancy. The district court prohibited Yanni from cross-examining Philabaum on this issue and the matter of her intimate relationships with other individuals.

After the district court denied Conteh's motion for a continuance in order to further prepare a cross-examination of witness Mahamadou Tunkara, Tunkara testified. A Gambian who lived in the United States since 1988, Tunkara recounted how he knew Conteh in Gambia and how Conteh told him about the money he got by depositing bogus checks. Tunkara was in New York at the time of the conversation, but Conteh and Conteh's brother convinced him to move to Denver, Colorado to assist in their scheme. Tunkara arrived in Denver in 1998. The Conteh brothers provided him with false identification and an apartment. Conteh told Tunkara to open a bank account, directed him to deposit a check for about $20,000, and had him withdraw thousands of dollars via an automatic teller machine. The proceeds from these transactions went to Conteh and Conteh carried the money to New York. Conteh informed Tunkara that a similar scheme existed

4

in Portland and that he had plans to expand the operation to other states. Tunkara testified that he pled guilty to bank fraud, received a prison sentence of time served, completed his probation, and paid his restitution.

Conteh's attorney objected to Tunkara's testimony about the Colorado scheme, but the district court admitted it pursuant to Federal Rule of Evidence 404(b). The court issued a limiting instruction explaining that Tunkara's testimony about Conteh's "other acts" was to be considered only with respect to Conteh's intent. Conteh's attorney assumed that law enforcement officers must have made notes or reports about Tunkara's criminal activities and moved for the production of documentary evidence under the Jencks Act, 18 U.S.C. § 3500 *et seq*., after Tunkara's direct examination. The Government stated that it had no Jencks Act materials to disclose and the district court denied Conteh's motion.

Another witness, Sharmila Isaiah, testified that a bank investigator contacted her and asked her to write a letter of explanation for a counterfeit check she cashed. The letter, which was shown to the jury on an overhead projector, explained that Yanni asked her to deposit the check in her account; that Ikenna Myers called her and told her to write him and Yanni checks from the credited funds; that Myers and Yanni came to Indianapolis to cash the checks; that Myers later told her to withdraw the remaining funds in $5,000 increments; and that

5

Myers and Yanni returned to Indianapolis to pick up the cash. Because the district court ultimately found Isaiah was not a co-conspirator, the letter could not be admitted under Federal Rule of Evidence 802(d)(2)(E). The court struck the letter from the record and instructed the jury to disregard it.

Witness Lemoyne Jackson testified that Walker introduced him to Conteh and that Conteh promised to pay him $500 to cash checks. Walker was with Jackson when Conteh gave Jackson a $24,869.10 check that Jackson thought was "kind of fishy." Walker traveled with Jackson from Columbus to Wheeling to cash the check. When Jackson cashed it, he gave $24,000.00 to Walker so Walker could deliver the money to Conteh.

During closing arguments, the Government—when recounting how Yanni hung up the phone on Philabaum as she explained that the bank told her the $54,000 check he gave her was bogus—characterized Yanni's reaction as "laughing in [Philabaum]'s face". Subsequently, Yanni's attorney argued that Philabaum was not credible because she was the sort of person who sought money from her boyfriend and mother to pay for her abortion. The Government, in its rebuttal, said:

> And somehow, we are to excuse Yanni's conduct because the word abortion comes into this courtroom. That is more than a red herring, that is a stinking fish, ladies and gentlemen. Yanni's conduct can't be

excused on that basis.

Additionally, defense counsel for Benjamin characterized Yanni as the kind of person who uses people for his own purposes.

On February 13, 2004, the jury found Conteh, Yanni, and Walker guilty of conspiring to launder money (Count 1), knowingly uttering and possessing counterfeit securities with the intent to deceive while aiding and abetting a co-defendant (Counts 2 and 9), and aiding and abetting bank fraud (Counts 11, 12, and 17). Additionally, the jury found Conteh and Yanni guilty of knowingly uttering and possessing counterfeit securities with the intent to deceive while aiding and abetting a co-defendant (Counts 3-8 and 10), aiding and abetting bank fraud (Counts 13-16, 18 and 19), and aiding and abetting interstate transport of counterfeit securities (Count 21). Conteh and Walker were also convicted of another aiding and abetting interstate transport of counterfeit securities charge (Count 22)[1].

At the April 2005 consolidated sentencing hearing, the district court sentenced Conteh to 120 months in prison and ordered him to pay restitution of $282,214.93. Yanni received a sentence of 70 months in prison and, like Conteh,

_____

[1] The remaining charges in the indictment, a forfeiture claim (Count 23) and an aiding and abetting charge (Count 2), are not at issue on appeal.

was ordered to pay restitution of $282,214.93. Walker was sentenced to 48 months in prison and ordered to pay $215,296.39 in restitution. The district court used the 2000 Sentencing Guidelines in an advisory fashion to impose sentences, as required by *United States v. Booker,* 543 U.S. 220 (2005).

The Appellants timely appealed their convictions and sentences. For the reasons that follow, we affirm the district court in all respects.

## II. JURISDICTION

This court has appellate jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a)(1).

## III. ANALYSIS

### A. Walker's Motion to Represent Himself

A defendant has a Sixth Amendment right to conduct his own defense. *See Faretta v. California*, 422 U.S. 806, 95 S. Ct. 2525, 45 L.Ed.2d 562 (1975). A district court's denial of a defendant's request for self-representation is reviewed for an abuse of discretion. *See Robards v. Rees*, 789 F.2d 379, 384 (6th Cir. 1986).

In *Robards*, a defendant moved to represent himself after trial had begun. The district court denied the motion and this court affirmed because the "request for self-representation, if honored, would have impermissibly delayed the

8

commencement of the trial . . . . [T]he trial judge would have been obliged to postpone the commencement of the trial for an extended period of time in order to allow [the defendant] a sufficient amount of time to prepare his defense." *Id.* at 384. Thus, the court determined that the trial court did not abuse its discretion by denying the motion. *Id.*

Like the defendant in *Robards*, Walker's motion for self-representation was filed after trial began. The motion was untimely and the district court did not abuse its discretion by denying it. *Id.*

### B. Sufficiency of the Evidence Challenges

A challenge to the sufficiency of the evidence is reviewed *de novo. United States v. Tocco,* 200 F.3d 401, 424 (6th Cir. 2000). When the denial of a motion for judgment of acquittal for insufficiency of the evidence under Federal Rule of Criminal Procedure 29 is challenged on appeal, "the standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime . . . " *United States v. Clay,* 346 F.3d 173, 176 (6th Cir. 2003) (quoting *United States v. Jones,* 102 F.3d 804, 807 (6th Cir. 1996)). The appeals court "may conclude a conviction is supported by sufficient evidence even though the circumstantial

evidence does not remove every reasonable hypothesis except that of guilt." *Id.*

### 1. Aiding and Abetting

To convict a defendant of aiding and abetting another to commit a crime, the Government must prove beyond a reasonable doubt that a defendant in some way associated himself with the venture "such that his participation [was] intended to bring about the crime or make it succeed." *See United States v. Clark,* 928 F.2d 733, 736 (6th Cir. 1991) (discussing 18 U.S.C. § 2). Thus, aiding and abetting involves (1) an act by a defendant which contributes to the execution of a crime; and (2) the intent to aid in its commission. *United States v. Lowery,* 60 F.3d 1199, 1202 (6th Cir. 1995) (citations and internal quotation marks omitted).

Conteh contends that he is entitled to acquittal on Counts 2, 3, 4, 5, 8, 9, 10, 11, 12, 13, 14, 17, 18, 19, 20, and 21 because the Government failed to prove that he specifically aided and abetted the people involved in the transactions or knew of the specific transactions. Conteh was not named in Count 20 and so he was not convicted of that offense. He fares considerably worse with respect to the remaining charges.

The record shows that Conteh provided middlemen Yanni and Walker with counterfeit checks totaling $436,000. (JA 2377). Yanni and Walker gave these

10

checks to the runners. (JA 1216, 1225, 1226, 1230, 1320-23; 1624). Conteh directed those below him with respect to depositing, cashing, and withdrawing the ill-gotten funds. (JA 1378-88; 1624-42). This evidence amply proves that Conteh contributed to the execution of the crimes and intended to aid their commission. There is no requirement that Conteh know of each individual transaction or of each specific individual engaged in each transaction. *United States v. Lawson*, 872 F.2d 179, 181 (6th Cir. 1989).

Counts 6 and 7 alleged Yanni aided and abetted Kombe by causing Kombe to possess and utter two counterfeit checks (one for Vascular Solutions, Inc. and one for Poly-Tex, Inc.). Counts 15 and 16 used the same language to charge Yanni with bank fraud. Yanni contends that there was insufficient evidence to convict him on these counts because Kombe denied that Yanni supplied him with the checks or directed him with respect to cashing them, etc. (JA 1384). Kombe stated that all of his dealings were with Conteh and Conteh's girlfriend Chhuom. (JA 1382-89; 1395; 1479). However, Kombe also stated that he and Yanni were still good friends and this statement suggests that Kombe may have been trying to minimize his friend's guilt. (JA 1377). In any event, Kombe's testimony provides sufficient evidence to uphold Yanni's convictions on Counts 6, 7, 15, and 16. Kombe testified how Yanni introduced him to Conteh, told him that Conteh could

11

help him out financially, took him to Conteh's home where Conteh explained about the scheme, and was present when Chhuom wrote Conteh a check in order to launder funds. (JA 1378, 1388, 1395, 1382). This evidence shows that Yanni contributed to the execution of the crimes by enlisting Kombe, and that Yanni intended to use Kombe to aid the counterfeiting and bank fraud scheme.

Counts 8 and 12 allege that Yanni aided and abetted Chhuom in the possession and uttering of a counterfeit Alzheimer's Association check and that he "caused" bank fraud by having her cash it. Yanni asserts that because Chhuom testified "either Mr. Walker or Mr. Yanni" instructed her to deposit the check, the evidence does not prove the aiding and abetting charges in Counts 8 and 12. (JA 1230). Yanni is incorrect. The evidence showed that both Yanni and Walker persuaded Chhuom to be a runner and that she would get money for depositing bogus checks in her account. (JA 1210, 1207). While Chhuom could not say for certain who told her to cash the Alzheimer's Association check, she clearly stated that Yanni and Walker recruited her into the scheme and directed her actions. (JA 1230). This is sufficient to support Yanni's aiding and abetting convictions.

Walker contends that there is insufficient evidence to support his aiding and abetting convictions, Counts 2, 11, and 12. Like Yanni, Walker attacks Chhuom's testimony because she could not say for certain who instructed her to cash the

bogus Alzheimer's Association and Allied Office Products checks. (JA 1216; 1225; 1226; 1230; 1320-23). Walker's argument fails for the same reason Yanni's failed. By testifying that both Yanni and Walker recruited her and directed her actions, Chhuom provided sufficient evidence to convict Walker.

Walker also contests his conviction on Count 22. Count 22 charged Walker with transporting in interstate commerce, with unlawful intent, falsely made, forged and altered securities, knowing the same to have been falsely made, forged and altered, in violation of 18 U.S.C. §§ 2314 and 2. The charge arose from Jackson's effort to drive from Columbus, Ohio to Wheeling, West Virginia for the purpose of cashing a bogus $24,869.10 check that was made out to Jackson from Farmer's Cooperative Grain Supply.

Although Walker contends otherwise, Jackson's testimony shows that Walker recruited him into the scheme. Jackson testified that Walker introduced him to Conteh. (JA 1624). Jackson said Walker was with him when Conteh gave him the $24,869.10 check and that Walker traveled with him from Columbus to Wheeling to cash it. (JA 1628; 1635). Jackson thought the check was "kind of fishy," but Conteh promised to pay him $500 if he cashed it. (JA 1632). Jackson cashed the check and gave $24,000.00 to Walker so Walker could deliver it to Conteh. (JA 1642). This testimony shows that Walker recruited Jackson into the

13

scheme. Walker's presence throughout the interstate transportation and cashing of the bogus check was intended to support and aid Jackson's completion of the illegal transaction. Accordingly, there is sufficient evidence to support Walker's aiding and abetting conviction.

### 2. Conspiracy to Commit Money Laundering Convictions

In order to convict a defendant of money laundering, the government must prove beyond a reasonable doubt that the defendant engaged in the financial transaction knowing that the transaction was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity. *See United States v. Elder*, 90 F.3d 1110, 1124 (6th Cir. 1996) (citing 18 U.S.C. § 1956(a)(1)(B)(i)). In *United States v. Garcia-Emanuel,* 14 F.3d 1469 (10th Cir. 1994)*,* the Tenth Circuit explained:

> [A] variety of types of evidence have been cited by this and other circuits as supportive of evidence of intent to disguise or conceal. They include, among others, statements by a defendant probative of intent to conceal; unusual secrecy surrounding the transaction; structuring the transaction in a way to avoid attention; depositing illegal profits in the bank account of a legitimate business; highly irregular features of the transaction; using third parties to conceal the real owner; a series of unusual financial moves cumulating in the transaction; or expert testimony on practices of criminals.

14

*Id.* at 1475-76 (citations omitted). This court has adopted *Garcia-Emanuel*'s interpretation of § 1956(a)(1)(B)(i) and applies it to the intent element of a money laundering conviction. *See United States v. Marshall*, 248 F.3d 525, 539 (6th Cir. 2001).

In Conteh, Yanni, and Walker's estimation, the withdrawal of funds from the runners' accounts does not constitute concealment. As support for their position, Conteh, Yanni, and Walker cite *United States v. McGahee*, 257 F.3d 520 (6th Cir.1996). In *McGahee*, a city employee approved a series of illegal disbursements to a building contractor. The disbursements included funds from a Housing and Urban Development block grant. The contractor deposited the funds into his personal business checking account. *Id.* at 524-25. The contractor was tried and convicted of conspiracy to commit money laundering. *Id.* at 525. On appeal, this court determined that there was insufficient evidence to support the charge. The court found the contractor merely diverted funds into his personal account and that diverting funds did not prove intent to conceal them. *Id.* at 528.

Unlike the contractor in *McGahee*, Appellants Conteh, Yanni, and Walker recruited third parties—the runners—to deposit and cash checks using the third parties' accounts. At Conteh, Yanni, and Walker's direction, the runners withdrew money and delivered the proceeds to them. (JA 1216, 1225, 1226, 1230, 1320-23;

15

1378-88; 1624-42). Conteh, Yanni, and Walker used these systematic deposits and withdrawals to help avoid detection of their scheme and to launder its proceeds. These transactions show that Conteh, Yanni, and Walker intended to conceal funds. Thus, there is ample evidence to prove the money laundering conspiracy. The *McGahee* decision does not help Conteh, Yanni, and Walker's cause.

### C.      Conteh and Yanni's Motion for Mistrial

The court uses an abuse of discretion standard when it reviews the denial of a motion for mistrial. *See United States v. Anderson*, 353 F.3d 490, 502 (6th Cir. 2003). Conteh and Yanni argue that the district court erred when it admitted witness Tunkara's testimony about the Colorado-based scheme under Rule 404(b). The court uses a three-step process to review admission of evidence pursuant to Rule 404(b):

> First, we review for clear error the district court's factual determination that sufficient evidence exists that the other acts occurred. Second, we review *de novo* whether the district court correctly determined that the evidence was admissible for a legitimate purpose. Third, we review for abuse of discretion the district court's determination that the "other acts" evidence is more probative than prejudicial under Rule 403.

*United States v. Matthews*, 440 F.3d 818, 828 (6th Cir.2 006) (citing *United States*

*v. Comer*, 93 F.3d 1271, 1277 (6th Cir. 1996)).

The district court thoroughly considered Tunkara's testimony before admitting it under Rule 404(b). The court heard Tunkara testify about how he knew Conteh in Gambia, associated with him in the United States, spoke with him about the scheme while in New York, heard how Conteh recruited other Gambians to participate in the scheme, moved to Denver to assist Conteh's scheme, received false identification from Conteh and Conteh's brother, and lived in a Denver apartment that Conteh secured for him. Based on this testimony, the district court reasonably concluded that the Colorado scheme existed.

Because Conteh was charged with specific intent offenses, the Government was entitled to admit evidence of "other acts" to prove intent. *See United States v. Everett*, 270 F.3d 986, 991 (6th Cir. 2001) (stating that bank fraud is a specific intent crime); *United States v. Spikes*, 158 F.3d 913, 930 (6th Cir. 1998) ("Rule 404(b) evidence is admissible to prove intent if specific intent is a statutory element of the offense.") (citations omitted). Case law also supports the admission of such evidence under Rule 404(b) to establish *modus operandi*. *See United States v. Perry*, 438 F.3d 642, 648 (6th Cir. 2006).

This leaves us only to consider whether evidence of the Colorado scheme

was admissible under Rule 403. In reviewing whether evidence is admissible under Rule 403, the court "look[s] at the evidence in a light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." *United States v. Zipkin*, 729 F.2d 384, 389 (6th Cir.1984). The evidence of the Colorado scheme was highly probative because it demonstrated Conteh's intent to commit a specific type of financial crime. Such probative value surpasses any prejudicial effect. *See United States v. Fraser*, 448 F.3d 833, 840-41 (6th Cir. 2006) (admission of excerpts from author's book *The Birth of a Criminal,* which described how to commit a counterfeiting crime, were admissible to show intent to commit counterfeiting).

Furthermore, the district court instructed the jury to consider the evidence of the Colorado scheme only with respect to Conteh's intent. *See Perry*, 438 F.3d at 649 (district court did not abuse its discretion in admitting evidence of "other acts" where it gave the jury an appropriate limiting instruction). The jury is presumed to have followed the instruction. Thus, Conteh and Yanni cannot show that the evidence of the Colorado scheme confused the jury. Because the district court properly admitted Tunkara's testimony and gave an appropriate limiting instruction, there was no error and no basis for a mistrial.

**D.     Conteh's Motion for a Continuance**

A trial court's decision to deny a continuance is reviewed for an abuse of discretion. *United States v. Crossley*, 224 F.3d 847, 854 (6th Cir. 2000). When a continuance is denied, the defendant must demonstrate actual prejudice resulting from the denial. He must demonstrate that a continuance would have made relevant witnesses available or added something significant to the defense. *Id.* at 855.

Conteh unsuccessfully moved to continue the trial so he could better prepare to cross examine Tunkara about the Denver scheme. Conteh speculates that a continuance would have allowed him time to find impeachment material, exculpatory evidence, etc. However, Conteh identifies no relevant witnesses or evidence that he would have used at trial if a continuance had been allowed. Conteh, therefore, cannot establish an abuse of discretion.

### E. Sharmila Isaiah's Testimony

"We review the district court's evidentiary decisions for abuse of discretion, and we will reverse only when we find that such abuse of discretion has caused more than harmless error." *Cooley v. Carmike Cinemas, Inc.,* 25 F.3d 1325, 1330 (6th Cir. 1994). "The harmless error standard calls for reversal when the appellate court lacks a fair assurance that the outcome of a trial was not affected by

evidentiary error. We shall, therefore, reverse the lower court only if we are firmly convinced that a mistake has been made." *McCombs v. Meijer, Inc.,* 395 F.3d 346, 358 (6th Cir. 2005) (citations and quotation marks omitted).

Yanni argues that the district court erred when it admitted Sharmila Isaiah's testimony. Isaiah testified that a bank investigator contacted her and asked her to write a letter of explanation for a counterfeit check she cashed. The letter, which was shown to the jury on an overhead projector, explained that Yanni asked her to deposit the check in her account; that Ikenna Myers called her and told her to write him and Yanni checks from the credited funds; that Myers and Yanni came to Indianapolis to cash the checks; that Myers later told her to withdraw the remaining funds in $5,000 increments; and that Myers and Yanni returned to Indianapolis to pick up the cash. (JA 625-26). Because the district court ultimately found Isaiah was not a coconspirator, the letter could not be admitted under Fed. R. Evid. 802(d)(2)(E). (JA 2157). Thus, the district court excluded the letter as hearsay, but allowed the testimony to remain in evidence. (JA 2157).

While Yanni may have been prejudiced by Isaiah's testimony, the abundance of evidence discussed throughout this opinion proves his involvement in the scheme. Furthermore, the district court had the letter removed from evidence and instructed the jury to entirely disregard any evidence ordered

20

stricken. (JA 2157, 2203) As this court explained in *United States v. Blakeney*, "properly prepared curative instructions are often sufficient to cure any prejudice resulting from the jury hearing inadmissible evidence." 942 F.2d 1001, 1030 (6th Cir.1991) (citations omitted). Here, the district court's instruction cured any prejudice Yanni suffered.

### F.     Conteh's Fed. R. Evid. 804(b)(3) Assertions

The district court prohibited Conteh from introducing hearsay in the form of recorded conversations between Yanni and Chuuom. Hearsay is admissible under Rule 804(b)(3) as a statement against interest if it was "at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Fed. R. Evid. 804(b)(3). Moreover, Rule 804(b)(3) provides: "A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." *Id.*

The district court reviewed the recorded conversations and determined that Yanni's statements about traveling to New York , staying there, and having a

21

contact were "vague" and, in context, "were not the kinds of statements that a person in Yanni's position . . . would have any reason to believe that they could subject him to any criminal liability . . . . They are not an admission of a crime of any kind. They do not on their face relate to any criminal activity of any kind. So they just don't fit the definition of the statement against interests [*sic*] as defined by the rule." (JA 1283-84). The district court's assessment of the recorded conversations and its application of Rule 804(b)(3) are both correct. Thus, the court did not abuse its discretion by barring the recordings.

## G. Hearsay and "Best Evidence"

Federal Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered as evidence to prove the truth of the matter asserted." Id. Under the "best evidence" rule, "[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress." Fed. R. Evid. 1002.

Conteh and Yanni contend that the district court erroneously admitted hearsay and evidence that violated the "best evidence" rule. The alleged Rule 802 violations stem from Myers, Kombe, and Tunkara's testimony. Myers testified

that he opened an envelope that contained what appeared to be a bogus check. (JA 1015). The envelope was addressed to Issa Conteh and identified "Hamidou" on the return address. *Id.* Kombe testified about two checks he received from Conteh. (JA 1415-1423). Tunkara testified about checks used in Conteh's Colorado scheme. The defense objected to all of this testimony, but the district court overruled their objections. (JA 1017-18; 1417-20; 1862-69; and 1953).

Under Federal Rule of Evidence 801(d)(2)(E), a "statement is not hearsay" if it is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Because Myers, Kombe, and Tunkara all conspired with Conteh, their testimony about documents they saw was not hearsay. Id. Moreover, the best evidence rule does not apply here because the witnesses testified from their personal knowledge. *D'Angelo v. United States*, 456 F. Supp. 127, 131 (D.Del. 1978) ("The [best evidence] rule is not applicable when a witness testifies from Personal [*sic*] knowledge of the matter, even though the same information is contained in a writing.").

## H. Philabaum's Testimony & Fed. R. Evid. 403

The court reviews a district court's determinations under Fed. R. Evid. 403 for an abuse of discretion. *See United States v. Sassanelli*, 118 F.3d 495, 498 (6th

Cir. 1997). A district court has "very broad" discretion to determine whether the danger of undue prejudice outweighs probative value. *See United States v. Vance*, 871 F.2d 572, 576 (6th Cir.1989).

Philabaum testified that, prior to becoming a runner, she told Yanni that she was pregnant, scared, and on her own. (JA 1499). She asked Yanni for help and he promised to pay her medical bills. (JA 1504). Yanni gave her a $54,060.80 check and Philabaum deposited it in her account. (JA 1504, 1527). She withdrew money from the account at Yanni's direction, including $13,027.98 of her own college savings. (JA 1507, 1503). When the bank advised her that the check Yanni gave her was bogus, Philabaum called Yanni and told him what the bank said. (JA 1515-17). Yanni hung up the phone. (JA 1517). Philabaum subsequently got sick, her baby died *in utero*, and she had to have her pregnancy medically terminated. (JA 1518).

Yanni objected to Philabaum's testimony about her pregnancy, arguing that it was inadmissible under Rule 403. (JA 1498). The district court overruled Yanni's Rule 403 objection after the Government explained that the pregnancy was relevant because Yanni was able to convince her to pass a bogus $54,000 check by saying that the money would be used to support her and the baby. (JA 1498-99). Based on Philabaum's testimony, the district court could conclude that

24

her relationship with Yanni was probative of her trust and dependence on him. Her circumstances and the trust she had in Yanni led her to cash the check and withdraw funds at his direction. Yanni was not unfairly prejudiced by this testimony. Therefore, the admission of Philabaum's testimony did not violate Rule 403.

Yanni also argued that because Philabaum alleged he got her pregnant, the district court should have permitted him to cast doubt on her veracity by questioning her about her sexual relationships. (JA 1533). Philabaum's sexual relationships were only probative to the extent they explained why she participated in the scheme. Questions about her other sexual relationships were irrelevant to her motives and would have only undermined her character. Rule 403 does not allow such unfairly prejudicial questioning.

## I. The Government's and Benjamin's Closing Arguments

Whether remarks by a prosecutor amount to prosecutorial misconduct and whether they rendered the trial fundamentally unfair are mixed questions of law and fact that are reviewed *de novo*. *United States v. Francis,* 170 F.3d 546, 549 (6th Cir. 1999). This court, however, reviews only for plain error "[w]here, as here, a criminal defendant has failed to object below . . . ." *United States v.*

*Emuegbunam,* 268 F.3d 377, 406 (6th Cir. 2001). "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." *Id.* (quoting Fed. R. Crim. P. 52(b)). "To establish plain error, a defendant must show that: (1) an error occurred in the district court; (2) the error was obvious or clear; (3) the error affected defendant's substantial rights; and (4) this adverse impact seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Id.* (citing *United States v. Kingsley,* 241 F.3d 828, 835-36 (6th Cir. 2001)).

"When reviewing claims of prosecutorial misconduct, we determine first whether the statements were improper." *Francis,* 170 F.3d at 549. If they were improper, then we look to see if they were flagrant and warrant reversal. *Id.* To determine flagrancy, the standard set by this court is: 1) whether the statement tended to mislead the jury or prejudice the defendant; 2) whether the statements were isolated or among a series of improper statements; 3) whether the statements were deliberately or accidentally before the jury; and 4) the total strength of the evidence against the accused. *Francis,* 170 F.3d at 549-50 (citations omitted).

Yanni contends his attorney should have objected during closing argument to two comments by the Government. First, when recounting how Yanni hung up the phone on Philabaum as she explained that the bank told her the $54,000 check

he gave her was bogus, the Government characterized Yanni's reaction as "laughing in [Philabaum]'s face". (JA 1298). Second, after Yanni's attorney argued that witness Philabaum was not credible because she was the sort of person who sought money from her boyfriend and mother to pay for her abortion, the Government offered this rebuttal:

> And somehow, we are to excuse Yanni's conduct because the word abortion comes into this courtroom. That is more than a red herring, that is a stinking fish, ladies and gentlemen. Yanni's conduct can't be excused on that basis.

(JA 2198-99).

While the prosecutor's remarks may have been inappropriate, the context in which he offered his characterizations means that his remarks cannot have misled the jury or caused prejudice. The comments were isolated, spontaneous responses to Yanni's closing remarks and minimally prejudicial given the total strength of the evidence against Yanni. The comments do not amount to prosecutorial misconduct.

Yanni also complains that Benjamin's attorney called him a "hardened criminal" and described him as a selfish opportunist who deceived people. (JA 2166; 2170). Based on the evidence, this characterization is a fair comment on the evidence. Accordingly, Yanni cannot show error.

27

As a final matter, Yanni contends that his counsel was ineffective because he did not object to the above comments. Ineffective assistance of counsel claims are more properly brought in a habeas petition under 28 U.S.C. § 2255. *See United States v. Seymour*, 38 F.3d 261 (6th Cir. 1994).

## J.      Cumulative Error

Errors that appear harmless in isolation may cumulatively amount to a denial of due process. *Walker v. Engle,* 703 F.2d 959, 963 (6th Cir. 1983). A "cumulative-error analysis should evaluate only the effect of matter[s] determined to be in error, not the cumulative effect of non-errors." *McKinnon v. Ohio,* No. 94-4256, 1995 WL 570918, at *12 (6th Cir. Sept. 27, 1995) (unpublished opinion) (quoting *United States v. Rivera,* 900 F.2d 1462, 1471 (10th Cir. 1990)); *see also Campbell v. United States,* 364 F.3d 727, 736 (6th Cir. 2004).

Yanni alleges the district court erred in allowing parts of Philabaum's testimony on direct, limiting cross-examination of Philabaum, permitting the Government and Benjamin to make various comments during closing arguments, allowing Tunkara to testify about the Colorado scheme, and initially allowing Isaiah to testify about the letter she wrote to the bank. For the reasons explained above, none of these decisions by the district court were errors. Because there was

28

no error, Yanni cannot establish cumulative error.

### K. *Brady*, *Giglio* and the Jencks Act

The court reviews the materiality of alleged *Brady* violations *de novo* because they present mixed questions of law and fact. *See United States v. Rivalta*, 925 F.2d 596, 598 (2d Cir. 1991), *cert. denied*, 502 U.S. 875, 112 S.Ct. 215, 116 L.Ed.2d 173. The court reviews a district court's ruling on Jencks Act issues for clear error. *See United States v. Minsky*, 963 F.2d 870, 875 (6th Cir. 1992).

The government has long been under an obligation to disclose evidence in its possession that is exculpatory and evidence that might tend to impeach the credibility of a key government witness. *See Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In *United States v. Mullins,* 22 F.3d 1365 (6th Cir. 1994), this court further elaborated on the *Brady* doctrine and noted that *Brady* is concerned only with cases in which the government possesses information which the defendant does not, and the government's failure to disclose the information deprives the defendant of a fair trial. Reversal is only required where "there is a 'reasonable probability' that, had the evidence been

29

disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Id.* at 1371 (quoting *United States v. Bagley,* 473 U.S. 667, 682 (1985)).

In this case, the Government disclosed plea agreements for its cooperating witnesses (the "runners"). Conteh and Yanni contend that they were prejudiced by the Government's failure to disclose transcripts of the runners' plea proceedings (*i.e.* plea agreements, plea hearing transcripts, *etc.*). Yanni claims that the transcripts would have provided him with material to contest the runners' claims that they lacked guilty knowledge or criminal intent.

Transcripts, so long as they exist, are kept by the clerk of the court and, unless sealed, are available to the public upon request. When transcripts do not exist, they can be created by a court reporter. Transcripts are not information which the government possesses and a defendant does not. Defendants can as easily obtain a transcript from the clerk or court reporter as can the government. The <u>Brady</u> doctrine did not require the Government to turn over any transcripts. Moreover, there is no error because the Defendants, being aware the runners pled guilty, "'knew or should have known the essential facts permitting [them] to take advantage of any exculpatory information'" and any challenged evidence "'was

available to defendant[s] from another source.'" *Id.* at 1371 (quoting *United States v. Clark,* 928 F.2d 733 (6th Cir. 1991)).

The Jencks Act provides that "[a]fter a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement . . . of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b). Disclosure of such material "must be made after the witness's direct examination testimony, and is mandatory if the defendant makes a timely motion." *Id.*; *United States v. Taylor,* 13 F.3d 986, 990 (6th Cir. 1994).

Yanni and Conteh contend that because Tunkara testified about the Colorado scheme on direct examination, the Jencks Act required the Government to disclose any statements he made to the FBI while cooperating with the investigation of the Colorado scheme. Under this court's "Adoption Test," a government report or notes of a witness's statement must be produced "if the notes from the interview were read back to and verified by the witness and if the report summarized the notes without material variation." *United States v. Williams,* 962 F.2d 1218, 1224 (6th Cir.) (quoting *United States v. Arnold,* 890 F.2d 825, 829 (6th Cir. 1989)), *cert. denied,* 506 U.S. 892, 113 S.Ct. 264, 121 L.Ed.2d 194

(1992). Conteh and Yanni offered the district court no proof that any statement was adopted or approved by Tunkara. Thus, the district court properly denied Conteh and Yanni's request for apparently nonexistent notes. *See United States v. Farley*, 2 F.3d 645, 654-655 (6th Cir. 1993) (finding no Jencks Act violation where defendants failed to satisfy Adoption Test)).

## L.  Conteh's Sentence

A district court's legal conclusions regarding the Sentencing Guidelines are reviewed *de novo*. The court's factual findings are reviewed for clear error. *See United States v. McDaniel*, 398 F.3d 540, 551 n.10 (6th Cir. 2005).

Following United States v. Booker*,* 543 U.S. 220 (2005), we review a district court's sentence to determine its reasonableness. *United States v. Foreman,* 436 F.3d 638, 644 (6th Cir. 2006). This review is both substantive, examining "the length of the sentence," and also procedural, requiring that the district court consider the factors in 18 U.S.C. § 3553(a), including the advisory Guidelines range. *United States v. Webb,* 403 F.3d 373, 383 (6th Cir. 2005) (quoting *Booker,* 543 U.S. at 262-63 (2005)).

The sentencing factors listed in § 3553(a) are:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed-
(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established [by the Guidelines] . . .
(5) any pertinent policy statement . . . by the Sentencing Commission . . .
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

The district court considered these factors. Prior to imposing sentence, it specifically addressed the $436,000 in loss, the number of victims, Conteh's recruitment efforts, the likelihood that Conteh's criminal activities extended beyond Ohio and the charged offenses, the sophistication of his scheme, the possibility of recidivism given Conteh's history, the risk Conteh posed to the public, the need for a just punishment, adequate deterrence, and the need to promote respect for the law. (JA 2399-2401). Even though Conteh's criminal history of category I and his total offense level of 27 resulted in a Guideline range of 70-87 months, the district court reasonably concluded that the preceding factors

33

necessitated a longer sentence. Contrary to Conteh's assertions, the fact that Yanni had an identical sentencing range and received a sentence of only 70 months does not make Conteh's sentence comparatively unreasonable. Yanni's involvement was not as extensive as Conteh's and the district court concluded that Yanni was "unlikely" to return to criminal activity. (JA 2370).

## M.    Yanni's Sentence

The comment to the Guidelines outlines the factors that a district court should consider when deciding whether to enhance a sentence for a leadership role. The factors are: the exercise of decision making authority; the nature of participation in the commission of the offense; the recruitment of accomplices; the claimed right to a larger share of the fruits of the crime; the degree of participation in planning or organizing the offense; the nature and scope of the illegal activity; and the degree of control and authority exercised over others. *See* U.S.S.G. § 3B1.1 cmt. n.4. A defendant need not meet each of these requirements for a district court to enhance his sentence. *United States v. Ospina,* 18 F.3d 1332, 1337 (6th Cir. 1994).

Although Yanni argued that his sentence should not have been enhanced because he was just a middleman, the district court found him to be much more. It

increased his base offense under U.S.S.G. § 3B1.1(a), which allows a four-level enhancement if a defendant is an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." At a minimum, a defendant whose sentence is enhanced under § 3B1.1(a) must have been the leader or organizer of at least one participant. *See* U.S.S.G. § 3B1.1, cmt. n.2. Participants include those persons "who were (i) aware of the criminal objective, and (ii) knowingly offered their assistance." *United States v. Anthony,* 280 F.3d 694, 698 (6th Cir. 2002).

At a minimum, the record shows that Yanni recruited and directed the criminal actions of Myers, Philabaum, Benjamin, Ingram, Watkins, and Alles. (JA 2285-2292). Yanni planned and organized multiple frauds, provided runners with bogus checks, instructed them to deposit the checks, directed the withdrawal of money, and collected the cash. As the testimony of Jackson and Chhuom shows, Yanni's runners were aware of his criminal objective and knowingly assisted his crimes. *See supra* pp. 11-13. Given these circumstances, the district court correctly imposed a four-level enhancement under § 3B1.1(a).

### N.    Walker's Sentence

Walker claims the district court erred because it used the 2000 Guideline Manual to sentence him. Because Walker failed to object, we review for plain

error. *United States v. Davis*, 397 F.3d 340, 346 (6th Cir. 2005).

Generally, the district court is instructed to apply the version of the Sentencing Guidelines that were in place at the time of a defendant's sentencing, unless applying the current Guidelines would amount to a violation of the *Ex Post Facto* Clause. *Id.* at 346 (citing U.S.S.G. § 1B1.11(a), (b)(1)(2002)); *see also* Art. I, § 9, cl.3 of the United States Constitution. "The *Ex Post Facto* Clause is implicated where a law punishes retrospectively; a law is retrospective if it changes the legal consequences of acts completed before its effective date." *Davis*, 397 F.3d at 347 (citations and quotations omitted).

When the district court sentenced Walker on April 29, 2005, the November 1, 2004, Sentencing Guidelines were in effect. Walker contends, and the Government assumes *arguendo*, that he would have had a total offense level of 24 under the 2004 Guidelines (calculated by finding a base offense level of 19 per § 2B1.1 and adding 2 levels under § 2S1.1(b)(2)(B) plus another 3 levels under § 3B1.1(b)). Since Walker had a criminal history of category I, his sentencing range would have been 51-63 months in prison. However, the district court used the 2000 Guidelines. (JA 2602). Applying the above-mentioned enhancements, the district court determined that Walker had a total offense level of 25 and criminal history of category I. *Id.* This resulted in a sentencing range of 57-71

36

months.  *Id.*  The district court recited the relevant factors under 18 U.S.C. §

3553(a) and sentenced Walker to 48 months in prison.  *Id.*

Although the district court should have used the 2004 Guidelines instead of

the 2000 Guidelines, Walker's sentence of 48 months was 3 months less than the

low end of the applicable sentencing range.  The Guidelines version the district

court used did not adversely affect Walker's sentence.  Accordingly, there was no

violation of the *Ex Post Facto* clause and no plain error.

### O.    Enhancement of Walker's Sentence

The district court enhanced Walker's sentence by 3 levels under U.S.S.G. §

3B1.1(b) due to his supervisory role in the offense and it enhanced his sentenced

by another 2 levels under § 2S1.1(b)(2) based on the value of laundered funds.

Because Walker did not object to the district court's imposition of an enhancement

for his aggravating role in the offense, the court reviews only for plain error.

*Davis*, 397 F.3d at 346.

Walker alleges that the district court erred by enhancing his sentence based

on facts not specifically authorized by the jury's verdict.  Walker is incorrect.  The

law of this Circuit clearly allows a district court to make factual findings regarding

relevant sentencing factors and apply those factors at sentencing.  *See United*

*States v. Coffee,* 434 F.3d 887, 897-98 (6th Cir. 2006). Accordingly, Walker

cannot show plain error.

### P. Amount of Loss Attributed to Walker

The court reviews for clear error whether a district court correctly

determined the amount of loss attributed to a defendant. *See United States v.*

*Tudeme*, 457 F.3d 577, 581 (6th Cir. 2006). Pursuant to U.S.S.G. §

1B1.3(a)(1)(B), a base offense level should be determined as follows:

> [I]n the case of a jointly undertaken criminal activity (a criminal plan,
> scheme, endeavor, or enterprise undertaken by the defendant in
> concert with others, whether or not charged as a conspiracy), all
> reasonably foreseeable acts and omissions of others in furtherance of
> the jointly undertaken criminal activity, that occurred during the
> commission of the offense of conviction, in preparation for that
> offense, or in the course of attempting to avoid detection or
> responsibility for that offense.

U.S.S.G. § 1B1.3(a)(1)(B).

In *United States v. Campbell*, 279 F.3d 392 (6th Cir. 2002), this court held

that § 1B1.3(a)(1)(B) requires that the district court make *particularized* findings

with respect to both the scope of the defendant's agreement *and* the foreseeability

of his coconspirators' conduct before holding the defendant accountable for the

scope of the entire conspiracy. *Id.* at 400 (emphasis in original). Walker argues

that the district court clearly erred because it failed to make particularized findings before determining his amount of loss. Despite Walker's claim, the record shows that the district court made the particularized findings set forth in *Campbell* before holding him accountable. (JA 2290-2386). The district court thoroughly reviewed Conteh, Yanni, and Walker's relationships at the consolidated sentencing hearing. *Id.* After doing so, the court initially determined that the three men were responsible for losses totaling $436,000. (JA 2366-67). However, Walker's attorney argued that Walker should not be held responsible for conduct he was acquitted of with respect to $128,000 in alleged dealings with Shannon Weikert and Kombe. (JA 2377). The district court agreed with this reasoning and reduced Walker's total amount of loss from $436,000 to $308,000. (JA 2379). Because a review of the sentencing transcript shows that the district court made particularized findings as to scope and foreseeability, Walker cannot show the court clearly erred when it determined his total amount of loss. (JA 2367-79).

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the district court in all respects.